**PLANNING BOARD OF THE TOWN OF NAPLES et al.**

v.

**Bert MICHAUD[1].**

Supreme Judicial Court of Maine.

Argued March 16, 1982.

Decided April 15, 1982.

---

1. We dismissed an earlier appeal by Michaud because claims by and against a number of co-defendants (Michaud's vendees) had not been resolved and there was therefore no final judgment. *Planning Board of Town of Naples v. Michaud*, Me., 435 A.2d 742 (1981). Since then the trial justice has entered a final judgment against Michaud alone under M.R.Civ.P. 54(b), stating that resolution of the remaining claims requires a prior answer by this court of the threshold question of whether the subdivision statute, 30 M.R.S.A. § 4956, applies to this campground, and that hence there is no just reason for delaying this appeal. Since the other defendants in the action brought in the Superior Court are not parties to that judgment or to this appeal therefrom, only Michaud is designated as a defendant in the caption of the case on appeal in the Law Court.

Isaacson, Isaacson, & Hark, Robert S. Hark (orally), Lewiston, for plaintiff.

Bernstein, Shur, Sawyer & Nelson, John M. R. Paterson (orally), Portland, for appellant Bert Michaud.

Before McKUSICK, C. J., GODFREY, NICHOLS, ROBERTS, VIOLETTE and WATHEN, JJ., and DUFRESNE, A.R.J.

McKUSICK, Chief Justice.

In the Superior Court (Cumberland County) the Planning Board of the Town of Naples has obtained a permanent injunction prohibiting defendant Michaud from selling any more fee simple interests in his campground, the Birch Point Colony Club, until he complies with the requirements of the subdivision statute, 30 M.R.S.A. § 4956 (1978 & Supp.1980). Michaud appeals, arguing that his plan of selling interests in his campground is not a subdivision within the meaning of the statute; and that if it is a subdivision, it is exempt from regulation by the operation of the "grandfather clause," 30 M.R.S.A. § 4956(5). We deny the appeal.

The Superior Court based its decision that Michaud's plan of selling interests in his campground was a subdivision on a set of stipulated facts and on the testimony of Michaud's agent, Wayne D. Wilkinson. The Birch Point camping area, located on Long Lake in Naples, has been operated since about 1964 as a seasonal campground. Occupying about 8.5 acres, it was and is licensed by the Maine Department of Human Services for 80 campsites. The campground consists of common areas—roads, restrooms, a lodge, etc.—and a number of campsites, at present fewer than 80. Each campsite has hookup facilities for water, sewage, and electricity, and is identified by a small numbered sign on a tree near those facilities. There are no marked divisions or defined boundaries between the campsites. Although a map of the campground prepared by its previous owners does show boundaries between the campsites, this map does not purport to be to scale, and it is not claimed that the boundaries shown on it correspond to any physical boundaries on the face of the earth.

On the record, it is not clear how the campground was operated by its former owners, but the parties assume, as do we, that it was operated in the same manner as the campground at issue in *Town of Arundel v. Swain*, Me., 374 A.2d 317 (1977): For a fee, a camper would occupy a campsite for "a period of one day, several days or a longer period." *Id.* at 318. According to Michaud's agent Wilkinson, the Birch Point camping area under the previous administration was open approximately from May 15 to October 15.

Defendant Michaud acquired the Birch Point campground in 1979 and has been selling interests in it as part of a scheme that he analogizes to a condominium conversion. Each interest is described as a common and undivided 1/80th interest in the campground with a right to use the facilities at a particular designated campsite. The fee simple deeds conveying these interests are by their express terms made subject to a Declaration of Covenants and Restrictions, which states among other things: "The general location of camping facilities will be from time to time designated by the Declarant [Michaud] but there shall be no specific boundaries." Wilkinson testified that the purchaser of an interest in the campground chooses his campsite at the time of purchase and that the campsites vary in price from $7,900 to $17,900, with the most expensive being those on the lake. The covenants and restrictions require that purchasers maintain a permanent residence elsewhere, that they keep at the campsite only a recreational vehicle (in mobile condition) with accessory tents and other paraphernalia, and that they erect no permanent structures other than a tent pad, fireplace, and the like. Michaud has sold eight fee simple interests and has ten more buyers lined up. He has not, however, applied for approval under the subdivision law.

The Superior Court found that purchasers acquired the perpetual right to exclusive use of particular campsites and were therefore persons whom the subdivision law was meant to protect; that since the use was not necessarily seasonal, the Town of Naples had an interest in planned community growth; and that the boundaries of the campsites were judicially ascertainable. The Superior Court concluded that Michaud's scheme to sell interests in the Birch Point campground constituted a subdivision within the meaning of 30 M.R.S.A. § 4956.

## I.

■ The statute defines a subdivision as "the division of a tract or parcel of land into 3 or more lots within any 5-year period ... whether accomplished by sale, lease, development, buildings or otherwise ...." 30 M.R.S.A. § 4956(1). We hold, as did the Superior Court, that Michaud, by selling more than two undivided interests in his Birch Point Colony Club along with exclusive rights to identified campsites, made a "division of a tract or parcel of land into 3 or more lots within [a] 5-year period" and became subject to the requirements of the subdivision law for municipal approval. *Id.*, § 4956(4).

Both parties agree that the critical case on the issue of whether the Birch Point Colony Club is a subdivision is *Town of Arundel v. Swain, supra,* in which we held that a campground physically similar to Michaud's was not a subdivision within the meaning of the statute. We interpreted the subdivision statute as being activated only by the splitting off of a real estate interest of greater dignity than the interest a transient camper has in his campsite. We said:

> [I]t is our judgment that when the statute speaks of a "division," it contemplates the splitting off of an interest in land and the creation, by means of one of the various disposition modes recited in § 4956 ["sale, lease, development, buildings or otherwise"], of an interest in another. This does *not* happen when a camper temporarily occupies a campsite.

. . . .

> Here, a single tract of land is involved, whether before or after its use as a campground. The situation is akin to the renting or occupying of space in an exhibition hall, a parking lot, or a drive-in theater. Of course, in all of these situations, land is somewhat parceled off, each customer being given a certain space to occupy for a certain period of time. But in our opinion this is not the type of "division" into "lots" which the legislature intended to regulate when it enacted § 4956.

374 A.2d at 320 (emphasis in original).

Plainly the key fact in *Swain* was the tenuous connection between the campers and the campsites they occupied. The facts of the case at bar are much different, and the reasoning of *Swain* leads us to the opposite conclusion. Purchasers of interests in the Birch Point Colony Club make a substantial investment and acquire a fee simple interest of perpetual duration. Although the Declaration of Covenants and Restrictions is drafted to suggest that Michaud may from time to time move his purchasers from one campsite to another—so he now argues to us—the evidence supports the Superior Court's finding that in reality a purchaser acquires an indefinite interest in a *particular* campsite: The purchaser chooses his campsite at the time of purchase and pays a price for it that varies by as much as $10,000 depending on the campsite's location. Further, although the stipulation of facts says only that the purchaser receives the right to exclusive use of the "facilities" at his campsite (a term that, as used in the stipulation, apparently refers only to the campsite hookups for water, sewage, and electricity), it is plain that the purchaser receives exclusive use of a broader area surrounding the facilities as well. This is evident from the fact that he may erect a tent pad, fireplace, and other minor installations. As a matter of common sense, one does more while camping than simply use the facilities. Although Wilkinson attempted to avoid a direct answer on this point, he eventually admitted that a purchaser of one campsite would not be

permitted to pitch a tent on a campsite already purchased by someone else. Clearly, each purchaser receives an indefinite fee interest in a unique and identifiable parcel of land, although the boundaries of the parcel are not well defined. We therefore conclude that there has been a division of the campground into lots so as to bring the Birch Point Colony Club within the scope of 30 M.R.S.A. § 4956.

The purposes of the subdivision law, evident from the factors the Planning Board must consider when passing on a subdivision application, 30 M.R.S.A. § 4956(3), buttress our conclusion. Those factors include, among other things, considerations of environmental quality, waste disposal, and water supply. Such considerations might well be of concern to the Planning Board now that the mode of operation of the Birch Point campground is changing from transient camping under a single ownership and management to quasi-permanent multiple occupancy. It appears that Michaud contemplates that when all 80 fee interests are sold, he will have divested himself of all management responsibilities. Those will be taken up by the "Birch Point Colony Club Association," a membership organization created for the purpose and composed of the new owners. The question arises whether management by those 80 owners would be as effective or responsible as management by a sole proprietor, Michaud. We notice, also, that while the campground under its previous regime was seasonal only, being open approximately from May 15 to October 15, the Superior Court found that the Birch Point Colony Club as contemplated by Michaud is "not necessarily limited to seasonal use." This finding is supported by the evidence. Although the Declaration of Covenants and Restrictions states that "[u]se of the camping facilities shall be limited to seasonal use as determined by the Board of Directors" of the Association, the Superior Court was justified in believing that the true understanding between Michaud and his purchasers was otherwise, in view of the fact that Michaud's advertisements for the Birch Point Colony Club boasted that it was available for "year round activities" including "cross country skiing, skimobiling, ice skating." Wilkinson testified that the campground does not have water and other facilities available during the winter months. That fact alone might be of considerable concern to the Planning Board.

Defendant argues that there are no "lots" in the Birch Point campground within the meaning of 30 M.R.S.A. § 4956(1) and hence no subdivision. Defendant relies on our refusal to regard the campsites in *Swain* as "lots," in part because they had no fixed boundaries. 374 A.2d at 320. But our reasoning in *Swain* cannot be divorced from the facts involved there. One who camps for one or two nights does not normally develop sufficient interest in or attachment to the land to care about precise boundaries, but one who pays up to $17,900 for a perpetual campsite and occupies it regularly for months and years can be expected to develop a sense of territorial imperative. A parcel of land can be a "lot" as much because it is considered so by those who trade in it and live on it as because its boundaries are precisely delineated on the face of the earth. The Superior Court found as a fact that "the boundaries of the individual camping sites in Birch Point Colony Club could be established by a court, for example, in the event of a dispute between occupiers," and that finding was not clearly erroneous. A court could be guided by the spacings of the camping facilities and the map drawn up by the previous owners. Also, most of the sites are already physically bounded on one, two, or even three sides by the lake and roads. We hold that the feasibility of judicially drawn boundaries, combined with the purchasers' possessory interest in their parcels, is enough to elevate these campsites to the status of "lots" within the meaning of 30 M.R.S.A. § 4956(1).

Indeed, so far from immunizing the Birch Point Colony Club from regulation under the subdivision law, the absence of clearly drawn boundaries, which could only be delineated by litigation, may well be another reason for the Planning Board to intervene.

The subdivision statute requires that each lot sold in a subdivision be marked by at least one permanent corner marker. 30 M.R.S.A. § 4956(4). In *Swain*, we noted the interest of the state and municipality in " 'accurate surveying, monumenting and legal description of properties to prevent fraud, to facilitate the marketing and conveyancing of land, and to enable accurate tax assessment and collection'." 374 A.2d at 320 n. 4, *quoting* Delogu, *Suggested Revisions in Maine's Planning and Land Use Control Enabling Legislation—Part II*, 21 Maine L.Rev. 151, 158 (1969). All of those concerns are fully relevant here. In addition, the Superior Court noted the possibility of petty border disputes between occupiers of the campsites. Accurate boundaries would reduce this problem, and their absence does not enable Michaud to escape the subdivision statute.

## II.

Defendant Michaud argues that even if the Birch Point Colony Club is a subdivision, it is in any event exempted from regulation under the subdivision statute's grandfather clause, subsection 4956(5), which provides in part: "This section shall not apply . . . to subdivisions as defined by this section in actual existence on September 23, 1971 . . . ." Defendant argues that the campground was in existence as a subdivision on that date because it has not been physically changed since then; its physical facilities apparently have in fact remained constant since they were installed sometime in the 1960s. To support his legal position, defendant points to *State ex rel. Brennan v. R. D. Realty Corp.*, Me., 349 A.2d 201 (1975), in which a subdivision was held to exist on September 23, 1971, because it had been marked into lots even though none of the lots had been sold.

*Swain* is fatal to defendant's argument, because under that case the Birch Point camping area, as a transient campground, was not a subdivision as of September 23, 1971. It therefore is not within the exception of subsection 4956(5). It is true that in *R. D. Realty* the subdivision was held to be in existence as of the relevant date because the lots had been surveyed and marked, though not yet sold; change in ownership was not there determinative. It does not follow, as defendant urges, that change of ownership can never be relevant, or that, because the campground has not changed physically, it must have been a subdivision all along. The language of subsection 4956(5) refers to "subdivisions *as defined by this section*." (Emphasis added) Subsection 4956(1) defines "subdivision" to include divisions "accomplished by sale, lease, development, buildings or otherwise." A division effected by sale, as in this case, would not necessarily result in immediate physical alteration; a division by development, as in *R. D. Realty*, could occur without immediate sale.

It is true that the operative definition of "subdivision" in subsection 4956(1) focuses upon the act of division—which if accomplished by sale or lease can occur without any immediate physical change in the land—while the grandfather clause, subsection 4956(5), by referring to "subdivisions . . . in actual existence on September 23, 1971," seems to focus on the physical status of the real estate. So in *R. D. Realty* it was appropriate to determine the existence of the subdivision by reference to the fact that the lots had been surveyed, numbered, and marked with steel pins or regular markers in preparation for sale.

However, an examination of that case shows how little the present defendant can gain from it. The real estate in *R. D. Realty* had been purchased by the developers well before the effective date of the subdivision law, and the developers had immediately set about preparing the land for a subdivision. Five miles of roads were cleared; a small office was built; an airstrip was prepared; the individual lots were surveyed and marked. The court said that "[m]any thousands of dollars have been expended by the developer in preparation of the development for the sale of lots." 349 A.2d at 202. This preparatory work occurred before September 23, 1971. The court rejected the proposition that a subdi-

vision had to be *completed* by September 23, 1971, in order to be "in actual existence" on that date, 349 A.2d at 204; but plainly *some* work had to be done in furtherance of the subdivision project before it could be held to exist. There is nothing of the sort before us in this case. Michaud did not even buy the campground until 1979. There is nothing that would in the slightest way suggest that, as of September 23, 1971, either Michaud or the then owners of the campground had even the slightest idea of the Birch Point Colony Club scheme that Michaud developed after taking over the campground eight years after the critical date of the grandfather clause.

Once we determine that Michaud's program instituted in 1980 of selling the Birch Point campground constitutes a "subdivision" subject to municipal regulation, we can find nothing in the statute to evidence a legislative intent to exclude that subdivision from the operation of the law that became effective on September 23, 1971. In 1971, nothing was "in actual existence," not even a planning concept, of the critical elements that turned the conventional transient campground operated by the prior owners into the Birch Point Colony Club being sold in fee simple interests by defendant Michaud. The Superior Court correctly enjoined Michaud from conveying any further interests in the subject real estate until he had the approval of the Planning Board of the Town of Naples under the subdivision law.

The entry must be:

Judgment affirmed.

All concurring.