LAKES ENVIRONMENTAL
ASSOCIATION, et al.

v.

TOWN OF NAPLES, et al.

Supreme Judicial Court of Maine.

Argued Nov. 15, 1984.
Decided Dec. 26, 1984.

Thomas F. Jewell (orally), Portland, for plaintiffs.

Isaacson, Hark & Epstein, Ronald L. Bissonnette, Robert S. Hark (orally), Lewiston, for Town of Naples.

Becker & Hawkins, Peter J. Becker (orally), Bridgton, for Bert Michaud.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, WATHEN and GLASSMANN, JJ.

WATHEN, Justice.

Defendants, the Inhabitants of the Town of Naples (the "Town"), the Planning Board of the Town of Naples (the "Board"), and Bert Michaud, d/b/a the Birch Point Colony Club (the "BPCC") appeal from a judgment of the Superior Court (Cumberland County) vacating the Board's issuance to Mr. Michaud of approvals and permits to sell undivided ownership interests in the subdivided BPCC campground. The Superior Court found that the Board misapplied the Minimum Lot Size Law (the "MLSL"), 12 M.R.S.A. § 4807 *et seq.* (1981). Plaintiffs, Lakes Environmental Association ("LEA") and Philip C. Chute, cross appeal on two issues: (1) the Superior Court's dismissal for failure to exhaust administrative remedies of their appeal in which they argue that the Town's Shoreland Zoning Ordinance (the "SZO") prevented the Board from issuing approvals and permits for Mr. Michaud's proposed subdivision, and (2) the Superior Court's denial of their appeal in which they argue that the State Subdivision Law, 30 M.R.S.A. § 4956 (1978 and Supp.1984–1985), was violated by the plan for the BPCC subdivision. We deny defendants' appeal. We also deny that portion of the cross-appeal based on alleged violations of the SZO; however, we grant that portion of the cross-appeal based on alleged violations of the State Subdivision Law.

The BPCC, owned by Mr. Michaud, consists of 8.42 acres of land in Naples. Since 1964, the land has been used as a seasonal campground, each campsite having hook-ups for water, sewage, and electricity. The campground also has common areas including roads, restrooms, and a lodge.

Before Mr. Michaud acquired the BPCC, sites at the campground were leased to users. Mr. Michaud began selling common and undivided 1/80th interests in the campground; the fee simple interests included the right to use the property at a particular site. The property is to be administered by the BPCC Association which would be composed of all the interest owners.

The present litigation is an outgrowth of a prior case before this Court involving the Board and Mr. Michaud. *See Planning Board of the Town of Naples v. Michaud,* 444 A.2d 40, 45 (Me.1982). On that occasion this Court affirmed an injunction prohibiting Mr. Michaud from conveying further interests until the Board approved the subdivision. The revised plan for the BPCC was subsequently approved by the Board on May 4, 1982. Deplorably, the full plan and application for approval is not included in the record. Apparently the plan shows the existence of setbacks from water, a common sewage system, deed description (a marker at one corner of each lot), a purifier and artesian well for drinking water, and provisions for constructing a back-up sewer system. The Board found that the deeds from Mr. Michaud to the buyers included covenants restricting the use of the campground to its past use. The Board made findings that no new development is proposed, no alteration of the topography is proposed, no new roads or streets are proposed.

According to the complaint filed in the Superior Court, pursuant to M.R.Civ.P. 80B, plaintiff LEA is a non-profit Maine corporation some of whose members own property abutting Long Lake (upon the shorefront of which some BPCC lots lie), and Philip C. Chute owns property abutting the proposed subdivision. Both LEA's executive director and Mr. Chute were present at the May 4, 1982 Board meeting at which the subdivision plan was approved. Both plaintiffs asserted that development of the BPCC according to the plan would result in extremely high density which could harm the owners of land near the campground. Plaintiffs appearances before the Board coupled with their allegations of particularized injury are sufficient to give plaintiffs standing. *See Harring-*

*ton v. Inhabitants of the Town of Kennebunk,* 459 A.2d 557, 559–560 (Me.1983).

■ When, as in this case, the Superior Court acts as an appellate court reviewing the action of the Board, the Law Court will examine directly the record as it developed before the Board. *See Driscoll v. Gheewalla,* 441 A.2d 1023, 1026 (Me.1982); *see also Keith v. Saco River Corridor Comm'n,* 464 A.2d 150, 153 (Me.1983). Further the Law Court is not free to substitute its judgment for the Board's but is limited to determining whether there was an abuse of discretion, error of law, or findings not supported by substantial evidence in the record. *See Saco River,* 464 A.2d at 153.

## I. *The Minimum Lot Size Law*

■ Mr. Michaud argues that because his application sought the Board's approval of a subdivision, the Board and hence the Superior Court, was limited to applying the State Subdivision Law and the Town's Subdivision Standards to the BPCC plan and that the Superior Court erred in considering the Minimum Lot Size Law. Neither the State Subdivision Law nor the Town's Subdivision Standards expressly refers to or incorporates the MLSL, 12 M.R.S.A. § 4807 *et seq.* The subdivision law, 30 M.R.S.A. § 4956(3)(F) (1978), states only that a subdivision "[w]ill provide for adequate sewage waste disposal." Mr. Michaud concludes that the Board is not empowered to consider compliance with the State's minimum lot size requirements in passing on a subdivision plan. We disagree.

Section 4807–A of the MLSL provides, in part: "In all areas of the State, notwithstanding any other provision of state or local law or regulation, no person shall" dispose of waste by a subsurface system unless certain lot size requirements are met. Section 4807–A requires a minimum of 20,000 square feet per single family residential unit. The average BPCC lot size is about 4,600 square feet. Section 4807–B permits subsurface waste disposal on lots smaller than those permitted by section 4807–A if the Board of Environmental Protection (the "BEP") grants its approval. Similarly, section 4807–C provides for approval of lesser frontage by the BEP. Finally, section 4807–G, provides that the BEP may seek an injunction for violation of the chapter.

■ Nothing in the MLSL states that a planning board may not deny subdivision approval for noncompliance with the MLSL. Rather, the MLSL merely assigns to the BEP sole authority to *approve* a lot that does not meet the MLSL's requirements. A planning board must consider whether lots in a proposed subdivision "provide for adequate sewage waste disposal" by applying the MLSL, *see* 30 M.R.S.A. § 4956(3)(F), along with other relevant considerations.

12 M.R.S.A. § 4807–A(1) makes the MLSL applicable to subsurface disposal of waste from any single family residential unit. "Single family residential units means any structure of any kind, including mobile homes, used or designed to house a single family, and shall include those structures used permanently and seasonally." 12 M.R.S.A. § 4807(4). The Board found that the interests conveyed were not single family residential units. Section 4807–A(2) makes the MLSL also applicable to subsurface disposal of waste from "any multiple unit housing or any other land use activity which may generate wastes in excess of the waste disposal requirements of normal single family residential units...."

The Board found that the BPCC plan was exempted from the MLSL by the MLSL's grandfathering provision. The Board ruled that the camping facilities to the extent they were structures, were complete as of January 1, 1972, and therefore their use was exempted from the requirements of section 4807–A by the grandfathering provision contained in section 4807–D. Paragraph two of section 4807–D exempts any structure in existence and in place on or before October 3, 1973, which

disposed of waste by a subsurface system. The term "structures" is not defined in the MLSL, but is itself used in defining "multiple unit housing" and "single family residential unit." *See* 12 M.R.S.A. § 4807(1) & (4).

■ Plaintiffs assert that the camping facilities do not constitute "structures." The municipal defendants contend that the term "structures" includes the sewer, water, and electrical hookups that exist (and existed before October 3, 1973) at the BPCC campsites. Absent statutory definition, terms should be construed in context and to implement legislative intent. *See Town of Arundel v. Swain*, 374 A.2d 317, 318, 321 (Me.1977). We conclude that the utility hookups do not constitute structures, and therefore the BPCC plan is not grandfathered under the second paragraph of section 4807–D.

■ Even though these campsite facilities do not constitute "structures," a subdivision plan still might be exempted under the first paragraph of section 4807–D which provides that: "[t]his chapter as to the use of a lot for single family residential purposes shall not apply to any lot which prior to January 1, 1970 was specifically described as an identifiable and separate lot ... provided that contiguous lots in the same ownership on or after October 3, 1973 shall be considered as one lot for the purposes hereof." By definition a subdivision creates lots. *See* 30 M.R.S.A. § 4956(1). The *Michaud I* Court found that the subdivision plan began only in 1980; before that the property was used as a transient campground. *See* 444 A.2d at 43–45. Thus, the BPCC lots cannot come within the January 1, 1970 deadline exempting use of a lot for single family residential purposes because no lots were created until 1980.

■ Although the Board found that the interests conveyed were not single family residential units, this "finding" is actually a conclusion of law. No one disputes the underlying facts. The dispute is how to characterize those facts. The only reasonable characterization is the following: the utility hookups are not structures. The lots will contain single family residential units using subsurface sewer systems, and the lots, therefore, are not exempt under section 4807–D because they were not in existence until 1980.

## II.  *Exhaustion of Administrative Remedies*

Count IV of plaintiffs' complaint alleged violations of the Town's SZO. The Board found that the BPCC plan did not violate the zoning ordinance. Plaintiffs appealed the Board's ruling on the SZO directly to the Superior Court, and they justify this procedure on the ground that the Town's Zoning Board of Appeals could grant only incomplete relief on their appeal as a whole. Plaintiffs argue that they should not be required to appeal their SZO complaint to the Zoning Board of Appeals while at the same time appealing their minimum lot size and subdivision law complaints directly to the Superior Court. We disagree.

■ Zoning issues decided by a Planning Board must be appealed to a Zoning Board of Appeals before they can be appealed to Superior Court, unless the local zoning ordinance provides for direct appeal to Superior Court. *See* 30 M.R.S.A. § 4963(1) (Supp.1984–1985). The Town's SZO is a zoning ordinance. *See Fletcher v. Feeney*, 400 A.2d 1084, 1086–1087 (Me. 1979). The Town's SZO does not provide for direct appeal of zoning issues to Superior Court. Although plaintiffs are correct that questions concerning subdivision law and minimum lot size law are not properly before a Zoning Board of Appeals, plaintiffs are incorrect that they can appeal an initial zoning determination directly to Superior Court merely because a zoning question is included in their appeal with non-zoning questions. *See Levesque v. Inhabitants of the Town of Eliot*, 448 A.2d 876, 877 (Me.1982) (subdivision ordinances are not zoning ordinances); *Benjamin v. Houle*, 431 A.2d 48, 49 (Me.1981) (general

and uniform citywide regulation is not zoning regulation).

In *Northeast Occupational Exchange, Inc. v. Bureau of Rehabilitation,* 473 A.2d 406, 410–411 (Me.1984), we recognized that exceptions to the rule requiring exhaustion of administrative remedies do exist. An exception was noted for those circumstances where: (1) because of direct involvement of the reviewing body in the initial decision, administrative appeal would be futile, (2) only questions of law are involved, or (3) the reviewing body has no power to grant the requested relief. None of these exceptions are applicable to this case. The Superior Court, therefore, properly dismissed plaintiffs' appeal of zoning issues.

### III. *State and Local Subdivision Law*

The Superior Court denied plaintiffs' appeal regarding the State Subdivision Law without explanation. Initially, defendants seek to avoid the thrust of the appeal by challenging the validity of the adoption of the Town's Subdivision Standards. The current Subdivision Law, 30 M.R.S.A. § 4956(2)(B), states that a municipal body "may, after a public hearing, adopt ... regulations governing subdivisions...." Defendants charge that before the Board could promulgate regulations under section 4956(2)(B), a public hearing had to be held, but no public hearing was held in this case and therefore the Board's adoption of the Subdivision Standards was invalid. The Planning Board adopted the regulations on May 4, 1972. At that time, section 4956(2) required neither a public hearing before adoption nor a Town meeting after adoption by the Planning Board for an effective subdivision regulation. *See* P.L.1971, c. 454. The Town's Subdivision Standards were adopted validly and are binding on the Town.

The Board found the plan to be in compliance with the State Subdivision Law. The Subdivision Standards require the Board to consider a number of general requirements in reviewing subdivision applications, and the burden of proving that the requirements are met is on the proponent of the subdivision. The plot plan reveals that the subdivision apparently will fail to conform with the Subdivision Standards' requirements for minimum lot size, minimum number of connections with public streets, and street design and construction standards. Where strict compliance with the Subdivision Standards may result in extraordinary and unnecessary hardship or where there are special circumstances, the Board may vary the "standards so that substantial justice may be done and the public interest secure...." Standard 12.2 permits waiver of required improvements in the public interest if special circumstances exist. Standard 12.3 states that when granting variances and modifications, the "Board shall require such conditions as ... will meet the objectives of the requirements so varied or modified."

The Board's findings state that "[n]o problems with traffic or traffic congestion" have been shown to exist in the past and none are anticipated in the future with the BPCC's "continued operation as proposed by the applicant." The Board concluded, therefore, that separate connections with the public highway are unnecessary. The Board also noted that no new road construction is proposed. Apparently, the Board considered the street design and construction standards to be applicable only to new road construction. The Board maintains a discrete silence on the plan's noncompliance with minimum frontage requirements on public streets and the water. The plan facially violates the frontage requirements, and no evidence exists that the Board waived those requirements.[1]

1. Although it is unclear, it appears that the Board may have based its result on the conclusion that the BPCC plan did not involve any change in the use of the campground. In doing so they relied at least in part on private covenants in the deeds to the interest owners which are not part of this record. The Board may not directly rely on the covenants because they are

The entry is:

Judgment vacating approval of the subdivision plan affirmed.

Judgment dismissing appeal on alleged violations of Shoreland Zoning Ordinance affirmed.

Judgment denying appeal on alleged violations of State Subdivision Law reversed and remanded for entry of an order vacating the approval.

All concurring.

enforceable only by the lot owners and not by the Town which is not a grantee or a party to the covenants. *See Whiting v. Seavey,* 159 Me. 61, 68, 188 A.2d 276, 280 (1963); *Leader v. LaFlamme,* 111 Me. 242, 245, 88 A. 859, 860–861 (1913).