STATE OF MAINE                                          SUPERIOR COURT
·CUMBERLAND, ss.                                        CIVIL ACTION
                                                        Docket No. CV-04-63



WINDWARD DEVELOPMENT, LLC,
et al.,

      Plaintiffs,

     v.                                                    ORDER

CUMMINGS ROAD BUSINESS PARK
ASSOCIATION,

      Defendant.


In this action plaintiffs Windward Development LLC and Edward Rowe seek a declaratory judgment with respect to a controversy between them and defendant Cummings Road Business Park Association over the development of Lot 14 in the Cummings Road Business Park. Based on the evidence at trial, the court makes the following findings of fact and conclusions of law. Most of the factual findings are contained in the section entitled findings of fact, although a few are set forth in the course of the legal discussion that follows.


FINDINGS OF FACT

1.     Windward Development, LLC, is the owner of Lot 14 in the Cummings Road Business Park. The owner and principal of Windward Development is Edward Rowe.

2.     Cummings Road Business Park is a commercial subdivision containing 23 lots located off Cummings Road in South Portland. The Cummings Road Business Park Association is an association of lot owners which is authorized to enforce the covenants

applicable to the Park, to oversee certain common areas and improvements within the Park, and to maintain the landscaped portion of the Park.

3. On October 21, 2002 Rowe came to a meeting of the Board of the Cummings Road Business Park Association to present building plans for approval.

4. Under the First Amended and Restated Declaration of Covenants and Performance Standards applicable to the Park (Trial Exhibit 1 – hereafter "Declaration"), a prospective purchaser, lot owner, or tenant is required to submit conceptual plans to the Cummings Road Business Park Design Review Committee prior to the construction of any buildings. The Design Review Committee initially was intended to consist of one representative appointed by the owner of Lot 2, one representative appointed by the owner of Lot 16,[1] and three members to be appointed by the developer of the business park. Once the developer no longer owned any lots in the park, the three members previously appointed by the developer were to be elected by the members of the Association.

5. As of October 21, 2002 the developer still owned a lot in the park. At the time the Cummings Road Business Park Association Board consisted of a representative of the developer (Florinda Franklin), a representative of Anthem BCBS (Michael Gagnon), a representative of Blethen Publishing (Christopher Ambrosini), and two lot owners (Lola Kampf and Dirk Thomas).

6. Although the foregoing individuals had been designated as the Cummings Road Business Park Association Board, they had not been designated as the "Design Review Committee," the entity named in the Declaration.

---

[1] Anthem BCBS is the owner of Lot 2, and Blethen Publishing is the owner of Lot 16. Anthem and Blethen are the two anchor tenants of the business park.

7.     When he appeared before the Board on October 21, 2002, Rowe had not closed on Lot 14, but he had signed a purchase and sale agreement. Rowe was accompanied on October 21st by James Thibodeau, an engineer who was working as a consultant for Rowe in connection with the development of Lot 14. In a prior job Thibodeau had done some design review for the developer of the Park.

8.     Rowe had devised a plan to turn Lot 14 into a condominium with nine units or "pods". Rowe's business (HVAC Products, Inc.) was to occupy one "pod" or building.[2] Other pods were to be subsequently developed and occupied by other businesses who would become members of Rowe's condominium.

9.     As of the summer of 2002 Rowe and Thibodeau were aware that the South Portland Planning Board was going to require subdivision review if multiple buildings were going to be constructed on Lot 14. They decided to initially submit only Rowe's building to the South Portland Planning Board for approval and seek subdivision approval at a later time. During the proceedings before the Planning Board, a representative of the city expressed the view that if the Rowe building was part of a phased project, it should be labeled as such. Thibodeau drafted a response stating that the project was "not phased at this time. The applicant does intend to discuss <u>future possibility</u> for subdividing this parcel into separate industrial condominium sites." Trial Exhibit 8A (emphasis added). <u>See</u> Trial Exhibit 6.

10.    At that time Rowe was unaware of the need to obtain approval from the Association's Design Review Committee. He only learned of that requirement in September of 2002 and asked to be placed on the agenda of the upcoming October 21st meeting. Rowe had not been represented by legal counsel in connection with his

---

[2] This was referred to at various times as building number eight.

purchase of Lot 14, and he was not aware of the covenants and performance standards applicable to the lot until he was already under contract.

11.    Rowe and Thibodeau did not take the requirement of approval by the Design Review Committee very seriously. Thibodeau expected that approval by the Design Review Committee would be a foregone conclusion, and the court will infer that he so advised Rowe. Although Rowe recalls that his closing was postponed to make sure that he obtained Design Review Committee approval, the documents show that there was a different reason that his closing was postponed – to allow Rowe to complete a "like-kind" exchange for tax purposes. See Trial Exhibit 12A.

12.    Rowe and Thibodeau did not make a formal submittal of their conceptual plans at or before the October 21, 2002 meeting. No transmittal letter was sent. No express or implied request for approval of a multi-unit condominium proposal was communicated at the meeting. There is considerable uncertainty as to what plans were shown to the Board members who attended the October 21st session (Franklin, Gagnon, Ambrosini and Kampf). No copies of any plans were retained by any members of the Board or by Kathy Nickerson, who attended the meeting as a representative of Dirigo Management Company.

13.    The court finds that Rowe's multi-unit condominium proposal was not approved at the October 21, 2002 meeting. Franklin, Gagnon, Ambrosini, and Kampf were never informed that approval was being sought at that time for a condominium proposal. Conceptual plans for a condominium proposal were not submitted at the meeting. Discussion focused on the plans for Rowe's own building, which was the only structure that had actually been designed and was ready to be constructed. After the

Board had approved plans for that building,[3] there was some discussion at the end of the meeting about Rowe's future intent to pursue a condominium concept. That discussion was at best inconclusive and did not occur under circumstances where Franklin, Ambrosini, Gagnon and Kampf had reason to know that the condominium concept was currently being presented to them for approval.

14. To the extent that Rowe and Thibodeau testified that there was a clear submission and request for approval of the condominium concept on October 21st and that express approval of that concept was given, the court does not credit their testimony. Rowe's memory was incorrect as to the presence of Ron Ward at the meeting and was colored in general by his anger over what he perceived as rude and duplicitous treatment by the Board. Thibodeau's memory was colored by his affiliation with Rowe and by the fact that it was part of his job to obtain approval. Moreover, Thibodeau's unconvincing testimony with respect to the existence of other violations of the development covenants (see Tr. 569-89) cast doubt on his credibility as a whole.

15. Some of the memories of defendants' witnesses with respect to the October 21, 2002 meeting may also have been colored by their desired outcome of the case. Notably, however, Florinda Franklin, described by plaintiffs as a "neutral" witness,[4] testified that the discussion of the condominium concept only came after Rowe's own building was approved and that no approval for a multi-unit concept was sought on October 21, 2002.

---

[3] Although the minutes of the meeting simply state that Rowe's building plans were unanimously approved (Exhibit 13), the evidence demonstrated that the Board actually requested Rowe to make a further submission showing the color of his building and roof. Rowe made a further submission with respect to colors and exterior finishes on May 12, 2003, and the colors and exterior finish for his building were approved the same day.

[4] See Plaintiffs' Post Trial Brief, dated February 16, 2005, at 9.

5

16. Following the meeting of October 21, 2002, Rowe incorrectly believed either that he had received sufficient clearance for his condominium concept or that when he sought future approval, it would be forthcoming. He proceeded to act on that belief by proceeding to install certain infrastructure for the multi-unit concept.[5]

17. The next meeting of the Board after October 21, 2002 was on March 6, 2003. On that date the Board minutes stated that the prior minutes were approved but went on to note that more information was needed.

18. On May 12, 2003 Rowe appeared before the Board and presented information as to the exterior finishes and colors that would be used for his building. Those were approved. No questions were asked and no information was provided as to Rowe's condominium concept at that meeting.

19. In September 2003 Rowe transferred ownership of Lot 14 to Windward Development LLC.

20. On October 14, 2003 Rowe appeared before the South Portland Planning Board seeking preliminary subdivision approval for his plan for the remainder of Lot 14. Trial Exhibit 22. As described to the South Portland Planning Board, Rowe was seeking to subdivide Lot 14 into nine individual development pods, and Lot 14 was to become the "Windward Way Business Park located within the Cummings Road Business Park." Id.

21. Rowe's concept for the nine pods was that each pod would be a separately designated building envelope which would constitute a condominium unit. Each unit

---

[5] The court finds that it is likely that Rowe would have taken certain of the actions in question even if it had been clear to him that the condominium concept had not been acted on. For instance, while there was testimony that Rowe installed a larger water main than needed for one building (Tr. 93-95), it would have been logical to order a larger water main even without approval in hand if he later foresaw the need for a larger main – otherwise the small main would have to be dug up and replaced. It also bears emphasis that at this time Rowe did not have subdivision approval from South Portland, although he anticipated that such approval would be forthcoming.

6

would own a fractional interest in all the common elements of the project. Each unit could be mortgaged, taxed, sold or otherwise transferred independently of all other units in the project. Each unit could also be separately foreclosed upon. Trial Exhibit 30. Every unit owner would have the exclusive right to develop his or her pod, and the boundaries of each pod could be traced on the face of the earth. Tr. 279, 561-62.

22. Rowe's October 14, 2003 presentation to the South Portland Planning Board attracted the attention of certain lot owners, who brought the issue to the attention of the Board. Some of those lot owners expressed their opposition to the Board at that time. On October 31, 2003 the Board met and decided to invite Rowe to a meeting to present his plan to the Board. Trial Exhibit 27.

23. On November 7, 2003 a letter was sent to Rowe inviting him to a meeting on November 10, 2003, and noting that the Board's review of Rowe's pending application before the South Portland Planning Board "strongly suggests violation of our covenants." Exhibit 28.

24. No meeting could be held on November 10, and a meeting was instead scheduled for November 24, 2003.

25. In the meantime, the annual meeting of the Cummings Road Business Park Association was held on November 17, 2003. At that meeting, which was attended by Rowe, the existing Board members (Ambrosini, Gagnon, Kampf, Dirk Thomas, and Alan Fishman) were nominated and elected. No election was held for members of a "Design Review Committee", but there is an entry in the minutes that the representative of one lot owner "brought up discussion of Ed Rowe's proposed project to the Association's Design and Review Committee." Trial Exhibit 29A. The minutes further recount that Rowe then discussed his proposed nine-pod concept and that Ambrosini "reported that nine buildings were unacceptable to the Committee and that

Ron Ward, Esq., from Drummond Woodsom & MacMahan was counseling the committee members." Id.

26.     On November 18, 2003 Thibodeau wrote a letter addressed to:

> Cummings Road Business Park Association
> c/o Chris Ambrosini
> Chairman Design Review Committee

That letter submitted the design for Rowe's multi-unit site plan development of Lot 14. The letter described Rowe's condominium plan and stated, contrary to the tack taken by Rowe and Thibodeau before the South Portland Planning Board, that the project "does not include any proposal for subdivision of this lot." Trial Exhibit 30 (emphasis in original). Thibodeau's letter did not state or suggest that in his view the Board or the Design Review Committee had previously approved the project.

27.     On November 24, 2003 there was a meeting attended by Rowe and Thibodeau for Windward Development LLC, and Ambrosini, Gagnon, Kampf, and Alan Fishman for the Board. Attorney Larry Clough (representing Rowe), Attorney Ron Wood (representing the Association), and Kathy Nickerson of Dirigo Management also were present. At that meeting Rowe and Thibodeau presented a slightly scaled down condominium plan with a total of eight development pods, including Rowe's existing building, to be called "Windward Circle Business Park." Thibodeau began the meeting with a suggestion that a multi-unit plan had been before the Board before, a statement that elicited disagreement from Ambrosini. That issue was not mentioned again.

28.     After that meeting, a written decision was issued by the Board in a document dated December 2, 2003 issued under the name of the "Board of

8

Directors/Design Review Committee" and received by counsel for Rowe on December 3, 2003.[6] Trial Exhibit 34. That decision denied Rowe's application on three grounds:

(1) that in violation of the Declaration, Rowe had not filed his conceptual plans with the Design Review Committee prior to submitting them to the South Portland Planning Board;

(2) that the proposed plan was inconsistent with the Declaration's stated requirement of a "harmonious, well-integrated campus-like environment"; and

(3) that the proposed development also violated the Declaration because the eight individual pods would not meet the minimum lot size requirement or the minimum street frontage requirement set forth in Article IV of the Declaration.

29. As noted above, the October 21, 2002 meeting had been held at a time when the developer still owned a lot in the Park. At the October 21, 2002 meeting the Board acted as the Design Review Committee.[7] Sometime after that meeting, the developer delivered the deed to its last remaining lot to the Association. At that point, according to the Declaration, the Design Review Committee was supposed to consist of representatives of Lots 2 and 16 plus three other members elected by the Association. However, no election was held, and the Board continued to function as the Design Review Committee on May 12, 2003. Trial Exhibit 16. Previous to that time Alan Fishman had replaced Franklin, who had been the developer's representative, on the Board. See Trial Exhibit 14. Fishman, however, was elected by the other Board members, not by the Association. Id. By the time of the November 24th meeting,

---

[6] The Declaration provides that if the Design Review Committee fails to respond within 10 business days of the submission of conceptual plans, the failure to respond will constitute approval. December 3rd was the 10th business day after submission of Rowe's plans on November 18th.

[7] There was testimony that one member of the Board, Lola Kampf, had not realized she was on the Design Review Committee until she was elected as a Board officer at the end of the October 21, 2002 Board meeting. See Trial Exhibit 13. The other three Board members who attended the October 21st meeting knew they were functioning as the Design Review Committee. In any event, no argument is being made in this case that on October 21, 2002 (as opposed to December 2, 2003) the Board was not authorized to act as the Design Review Committee.

9

however, the Board had been elected by the Association (see Trial Exhibit 29A). No separate election for a "Design Review Committee" had been held. Instead, the Board continued to function as a *de facto* Design Review Committee.[8]

30. On June 21, 2004, after the commencement of this action, Rowe sent a letter to Nickerson at Dirigo Management complaining that various other lot owners were in violation of various covenants of the Cummings Road Business Park. The purported violations involved such things as the position of loading docks, the location of dumpsters, and the use of pre-engineered structures. Plaintiffs also presented evidence as to these alleged violations at trial based on testimony of Rowe and Thibodeau. As amply demonstrated during the cross examination of Thibodeau, these complaints either were unfounded, were *de minimis*, were based on speculation, or otherwise could not be proven at trial.[9] Tr. 569-89, 591-92. None of the purported violations asserted by plaintiffs bore any relationship to the approval or disapproval of Rowe's development plan for Lot 14. Rowe complained about those violations, not because he thought they were well founded or because he cared about them, but because he was angry at the Association. Tr. 285.

31. The site plan for Rowe's proposed condominium project, as submitted on November 18, 2003, is depicted on Trial Exhibit 31. A map of the Cummings Road Business Park is set forth on Trial Exhibit 1B. The evidence in this case included a view by the court of the Business Park and of Lot 14 from Gannett Drive. The Park lies to the west of Cummings Road and is traversed by Gannett Drive. Located on the left at the south end of Gannett Drive is a large multi-storied office building housing the corporate

---

[8] The evidence suggests that from October 21, 2002 through November 24, 2003 only one other project besides Rowe's was submitted for Design Review – a proposal for Lot 15, which was conditionally approved on May 12, 2003. Exhibit 16.

[9] Indeed, Thibodeau's testimony on this issue was so unconvincing as to cast doubt on the credibility of his testimony on other issues.

headquarters of Anthem. To the north along Gannett Drive are several medium-sized one-story office buildings, mostly with brick facades, each with its own parking area. At the north end of the park on the left are some smaller and more eclectic buildings, notably the Cumberland County Gymnastics Center, the building on Lot 13, and Rowe's own building. The latter is unobtrusive and faces away from Gannett Drive. On the right as one exits the north end of Gannett Drive is the very large, mostly windowless building of Portland Newspapers, which is on higher ground than the remainder of the buildings at the north end of the park and which is very noticeable from Cummings Road.


CONCLUSIONS OF LAW

1.    Alleged Approval of Condominium Concept on October 21, 2002

The findings of fact set forth above lead to rejection of plaintiffs' claim that their multi-unit condominium concept was approved at the October 21, 2002 meeting. To the extent that plaintiffs are suggesting that the condominum concept was approved because it was discussed on October 21, 2002 and not responded to within 10 days, this is refuted by the findings that plaintiffs did not let the Board know they were requesting approval of the condominium concept on October 21, 2002 and that none of the board members knew or had reason to know that the condominium concept was being presented for approval at that time. A discussion of possible future condominium plans -- after Rowe's own building had been approved -- did not constitute a request for approval of a multi-unit plan.

## 2. Plaintiff's Claims of Other Covenant Violations

Similarly, the court's findings of fact establish the spuriousness of plaintiffs' claim that the Association is not entitled to enforce its covenants because it has overlooked other violations.

## 3. Authority of Board to Act as Design Review Committee

Given its findings that the Board did not approve a multi-unit concept on October 21, 2002 and that the Association has not waived its right to enforce its covenants, the court turns its attention to plaintiffs' challenges to the validity of the Board's December 2, 2003 decision denying plaintiffs' application.

At the outset, plaintiffs contend that the December 2, 2003 decision cannot be sustained because the Board lacked authority to act as the Design Review Committee. This poses an interesting issue on which neither the parties nor the court have found much pertinent authority. While plaintiffs argue with some force that the lack of a properly constituted Design Review Committee means the Board had no authority to disapprove their condominium plan, it does not follow that the condominium plan should be automatically deemed approved. As a matter of logic, it would make more sense to conclude that if the Board lacked authority to approve or disapprove plaintiffs' plans, the Board's December 2, 2003 decision would be invalid and plaintiffs should be given the opportunity to resubmit their application to a properly constituted Design Review Committee.[10]

---

[10] Plaintiffs argue that this would also require that every project previously approved be resubmitted to a newly constituted committee. The court disagrees. First, as long as the developer owned lots in the park, the Design Review Committee was to consist of representatives of Lots 2 and 16 and three other members appointed by the developer. On this record, it is not clear that the committee was not properly constituted for some or all of the approvals given prior to the developer's exit. Second, and more importantly, even if the Design Review Committee was never properly constituted, any projects that had been approved and that had in fact been built would not be jeopardized. Once buildings had been

However, the court concludes that this issue can be resolved on other grounds. By the time of both the November 24, 2003 meeting and the December 2, 2003 decision, the Board of Directors had been elected at the annual association meeting. After the developer's exit, the Design Review Committee was supposed to consist of one representative from Lot 2 (Anthem), one representative from Lot 16 (Blethen Publishing), and three members elected by the Association. See Declaration Article I. Although no election for a "Design Review Committee" was ever held, the existing Board members met the necessary criteria for that committee. In addition, it can be inferred from the events at the November 17, 2003 association meeting that it was known to the members of the Association, including Rowe, that the Board was acting as a *de facto* Design Review Committee. Having been present at the annual meeting, Rowe knew there had been no separate election of a Design Review Committee. If Rowe had wished to object to the Board's authority to act as a Design Review Committee, he could have done so. By the time of the November 24, 2003 meeting, moreover, Rowe was accompanied by counsel, who did not raise the issue.

The court therefore concludes that the December 2, 2003 decision should not be overturned on the grounds that the Board was not authorized to act as the Design Review Committee.

### 4.    Failure to Follow Procedural Requirements

The court concludes that the December 3, 2003 decision cannot independently be sustained on the ground that Rowe violated the Declaration's requirement that a development plan must be submitted to the Design Review Committee prior to

constructed based on Board approval, the Association and its members would be estopped from attempting to retroactively revoke their approvals. This argument would also apply to Rowe insofar as he had already built his own building.

13

submission to the South Portland Planning Board. This is true for two reasons. First, counsel for the Association has acknowledged that Rowe's plan would not have been turned down solely for this reason. Second, the evidence reflects that the Board had not adhered to this requirement in the past. Indeed, Rowe's own building, which was approved by the Board on October 21, 2002, had previously been submitted to the South Portland Planning Board for approval.

5.     "Harmonious Well-Integrated Campus-Like Environment"

The second ground set forth in the December 2, 2003 decision for disapproving plaintiffs' condominium proposal was that subdividing Lot 14 would be inconsistent with the Declaration's express goal of promoting a "harmonious well-integrated campus-like environment." According to the December 2, 2003 decision (Trial Exhibit 34), the condominium proposal was not harmonious and well integrated either "physically" or "administratively". On the subject of physical consistency, the decision stated that under Rowe's proposal the development of eight separate buildings "will be inconsistent with the development pattern well established in the Park." On the subject of administrative consistency, the decision stated that the individual lot owners within Lot 14 would be governed by a separate and independent condominium association, raising governance problems in terms of the enforcement of the Association's covenants against individual members of the condominium.

The operative language under the Declaration is as follows:

> The Design Review Committee shall ensure high standards in the design and construction of improvements in the Park and shall promote a harmonious, well-integrated campus-like environment. To that end the Committee shall review all proposed development in the Park and shall consider such factors as location, configuration, materials and color schemes of all proposed buildings and improvements, as well as all proposed landscaping and signage.

14

Declaration, Article I.

Given the principle that restrictive covenants are to be narrowly construed, with any ambiguity resolved in favor of less restrictive uses of the property, Boehner v. Briggs, 528 A.2d 451, 453 (Me. 1987), the court cannot interpret the harmonious well-integrated standard to embrace the so-called "administrative" issues relied on by the Board. The harmonious, well-integrated standard is a design standard intended to ensure high quality design and construction and to prevent visual and spatial incongruities that would detract from the value and ambience of the other properties in the park. The court cannot therefore uphold the Board's December 2, 2003 decision to the extent that it relied on so-called administrative issues.

Turning to the physical issues, it bears emphasis that the "harmonious well integrated campus-like" standard is susceptible to being interpreted in a highly subjective manner. Once again, given the principle that restrictive covenants are to be narrowly construed, the court concludes that this standard must be interpreted as objectively as possible – to prevent obvious incongruities and obviously low-quality design and construction without giving the Design Review Committee discretionary authority to reject a lot owner's plan just because it has a different taste in architecture or harbors some animosity for the lot owner.

Measured against this standard, it is evident that issues involving building design, exterior finishes, and colors for the seven additional structures proposed under Rowe's amended condominium plan were not before the Board on November 24, 2003.[11] All the Board had before it were site plans setting forth the footprints of the

---

[11] These had been the issues that the Board had concerned itself with in reviewing Rowe's own building on October 21, 2002.

15

proposed buildings. See Trial Exhibit 31. Under the Declaration, the Design Review Committee has the right to review specific building plans, and it would have retained that right with respect to any specific buildings to be constructed in the future. As of December 2, 2003, however, no decision on "harmoniousness" could be made with respect to the exterior design of future buildings. Moreover, the "harmoniousness" of future buildings could be ensured by such measures as employing the same architecture, exterior finishes, and color scheme used for Rowe's own building. Such issues would therefore have justified a decision by the Board to require submission of all the specific building plans in the future, but they cannot form the basis for rejection.

That leaves the question of whether, as the Board found, the number of the buildings proposed would in and of itself be inconsistent with the "harmonious well-integrated campus-like environment" standard. Based on the site plan and its view of the Park, the court concludes that the number of buildings would not be sufficiently inconsistent with the existing environment of the Park that it can uphold the December 2, 2003 decision on this issue.

At the outset, Cummings Road Business Park does not present the uniform appearance of the Bowdoin College Campus or the Harvard Yard. The buildings in the Park are not uniform in size, appearance, or architectural style, and the Park is not fully harmonious to begin with. Specifically, as noted in the findings of fact, the area of Gannett Drive where Lot 14 is located is not adjacent to the larger, more imposing corporate headquarters buildings but is in an area with more eclectic, smaller buildings. In addition, six of the proposed buildings to be built on Lot 14 would be partially or wholly screened by Rowe's existing building and could be further screened by

16

landscaping or fencing if necessary.[12] The remaining proposed building would be set off by itself to the east along Gannett Drive. Given the amount of frontage of Lot 14, that building would not appear materially different from other buildings located along Gannett Drive.

Accordingly, construing the covenants strictly against restrictions on plaintiffs' property, and given the inherent difficulties in applying a potentially subjective "harmonious, well-integrated campus-like environment" standard, the court cannot sustain the December 2, 2003 decision on the ground that standard was not met.

6.     Lot Size and Street Frontage Requirement

At the outset, it bears emphasis that the Declaration does not expressly bar any further subdivision of the existing lots nor does it preclude multiple ownership under condominium or other arrangements. Article IV of the Declaration (entitled "Space and Bulk Regulations") does contain lot size and street frontage requirements. However, under the Declaration, the Design Review Committee is not given any jurisdiction over the lot size and street frontage requirements; the Committee's role is discussed only in Article I of the Declaration. As a result, the court interprets the minimum lot size and street frontage requirements as being independently applicable to plaintiffs' lot regardless of the Board's December 2, 2003 decision.[13] Nevertheless, there is a live controversy between plaintiffs and the Association as to whether plaintiffs' condominium proposal violates those conditions.

---

[12] Requirements for such landscaping and fencing could be imposed at the time individual buildings are submitted for individual design review.

[13] As to the minimum of size and street frontage requirements, therefore, whether the Board properly acted as a Design Review Committee on December 2, 2003 is irrelevant.

17

Specifically, Article IV of the Declaration provides in pertinent part as follows:

1. The minimum Lot size allowed shall be two (2) acres . . . . Provided, nonetheless, that adjacent Lots under the same ownership may, at the election of the owner thereof, be treated as a single Lot for the purpose of the space and bulk regulations established herein.

2. The minimum street frontage allowed for each Lot shall be . . . one hundred (100) feet . . . . Provided, nonetheless, that adjacent Lots under the same ownership may, at the election of the owner thereof, be treated as a single Lot for the purpose of the space and bulk regulations established herein.

Trial Exhibit 1.

Lot 14 consists of 7.31 acres and (per Trial Exhibit 31) has 310.91 feet of frontage on Gannett Drive. If Rowe's condominium proposal is seen as creating additional lots, therefore, there would be space for only three such lots (not the eight proposed by Rowe) before some of the lots would be less than 2 acres and have less than 100 feet of frontage.

On the issue of whether Rowe's condominium proposal would result in "subdividing" Lot 14 and creating 8 new lots on that space, both parties have directed the court's attention to decisions issued in connection with the state's subdivision laws. Plaintiffs argue, citing Town of York v. Cragin, 541 A.2d 932, 934 (Me. 1988), that the conversion of property into a multi-unit condominium does not create separate lots or constitute a subdivision. Defendants argue, citing Town of Orrington v. Pease, 660 A.2d 919, 922 (Me. 1995) and Planning Board of Town of Naples v. Michaud, 444 A.2d 40, 42-43 (Me. 1982), that the creation of identifiable parcels whose boundaries can be determined on the face of the earth, with separate ownership interests that can be transferred and mortgaged, constitutes the creation of separate lots that must independently comply with the lot size and street frontage requirements in the Declaration.

18

On this issue the court agrees with defendants. The Cragin case relied on by plaintiffs is distinguishable because in Cragin a single building was involved. The Law Court expressly held that "the division of a structure, as opposed to the division of a parcel of land into lots, does not result in the creation of a subdivision . . . " 541 A.2d at 934 (emphasis added). The Pease and Michaud cases, in contrast, support the conclusion that what Rowe contemplates here is the division of his parcel into separate lots. See 660 A.2d at 922; 444 A.2d at 42-43.

That does not, however, end the inquiry because the Declaration provides that for both the lot size and street frontage requirements, "adjacent lots under the same ownership . . . may be treated as a single lot." Under this provision, Rowe could subdivide Lot 14 into separate lots, retain ownership of those lots, keep his own building for himself, and lease buildings on the seven other lots to various commercial tenants without violating the lot size and street frontage requirements. Under these circumstances, the court has difficulty seeing why, instead of retaining ownership himself, Rowe cannot transfer ownership to a condominium association. The Association argues with some force that if lot owners could evade the lot size and street frontage requirements by "condominiumizing" their lots (in Thibodeau's words, Tr. 455), the lot size and street frontage requirements would be rendered to some extent meaningless. It can also be argued that creating a business park within a business park is inconsistent with the spirit of the Declaration. Nevertheless, that result is permitted under the Declaration as drafted.


7.    Association's Claim for Attorneys Fees

Article VII of the Declaration provides, *inter alia*, that the Association "may levy limited assessments against a particular lot or lots for reimbursement for costs resulting

19

from the lot owner's breach of any provision of these covenants and performance standards." Under this provision, the Association seeks its attorneys fees in litigating this action.

The court concludes that plaintiffs are not in breach of any provisions of the covenants. The Association's claim for attorneys fees under Article VII of the Declaration is denied.

8.      Conclusion

The entry shall be:

On Plaintiffs' request for a declaratory judgment, the court declares and adjudges as follows:
(1)     The Cummings Road Business Park Association Board did not approve any multi-unit condominium proposal on October 21, 2002;
(2)     The Association did not waive its right to enforce its covenants by overlooking other violations;
(3)     Although no Design Review Committee under Article I of the Declaration of Covenants was ever properly constituted, the Association Board acted as *de facto* Design Review Committee and plaintiffs did not object to going forward on that basis;
(4)     The Association Board's December 2, 2003 decision cannot be sustained on the stated grounds that plaintiffs violated procedural requirements or that plaintiffs' proposal did not promote a "harmonious well-integrated campus-like environment;"
(5)     Plaintiffs' eight unit condominium plan submitted to the Board on November 18, 2003 does not violate the minimum lot size and street frontage requirements set forth in the Business Park's Declaration of Covenants; and
(6)     The Association's Design Review Committee shall retain the right to review conceptual plans for any future buildings to be built on Lot 14 pursuant to the applicable provisions of the Declaration.
Finally, judgment is entered in favor of plaintiffs and against defendant on the defendants' claim for attorneys fees under Article VII of the Declaration of Covenants.
No costs. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: November 14, 2005

_____
Thomas D. Warren
Justice, Superior Court

20

F COURTS
ind County
lox 287
ne 04112-0287

DAVID SHERMAN, ESQ.
PO BOX 9781
PORTLAND, ME 04104-5081



COURTS
nd County
ox 287
ie 04112-0287

DAVID HIRSHON, ESQ.
PO BOX 15060
PORTLAND, ME 04112-5060

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-04-63

TDJJ-CUM-1/20/06

WINDWARD DEVELOPMENT
LLC, et al.,

       Plaintiffs,

v.

ORDER

CUMMINGS ROAD BUSINESS
PARK ASSOCIATION,

       Defendant.

Before the court is defendant's motion to alter or amend its order filed November 14, 2005 pursuant to Rule 59(e).

Defendant raises two primary arguments. The first is that the court erred in interpreting the space and bulk regulations in Article IX of the Declaration of Covenants as permitting new lots to be created from the original 23 lots. However, paragraphs 1 and 3 of the space and bulk regulations do not support defendant's argument. Paragraph 1, for example, provides as follows:

> 1.     The minimum Lot size allowed shall be two (2) acres (with the exception of Lot #11, which shall not be less than 1.75 acres). Provided, nonetheless, that adjacent Lots under the same ownership may, at the election of the owner thereof, be treated as a single Lot for the purpose of the space and bulk regulations established herein.

The evidence at trial demonstrated that all of the original lots with the exception of Lot 11 (which was 1.79 acres) exceeded 2 acres in size. See Exhibit 1 B. As a result, there would be absolutely no reason to include the proviso that lots under common ownership could be treated as a single lot for purposes of the acreage requirement if the original lots were intended to be fixed and immutable.

The evidence at trial does not include exact street frontage distances for the original 23 lots, but as far as the court can estimate from Exhibit 1 B, all the original lots met the 100 foot requirement set forth in paragraph 3 of the space and bulk regulations.[1] Once again, there would be no purpose for the provision that the lots under common ownership could be treated as a single lot for purposes of the street frontage requirement if the original lots could not be subsequently divided. The court therefore adheres to its interpretation.

The second argument made by defendant is that the court gave no deference to the decisions of the Board, sitting as the Design Review Committee. This is correct. However, defendant has offered no Maine authority for the proposition that such deference is required and, in the court's view, Boehner v. Briggs, 528 A.2d 451, 453 (Me. 1987), stands to the contrary.

The entry shall be:

Defendant's motion to amend the judgment is denied. The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

DATED:     January 20, 2006

Thomas D. Warren
Justice, Superior Court

---

[1] This is confirmed by a copy of the amended final subdivision plan submitted by plaintiffs in opposing defendant's motion. As far as the court can tell, this document was not introduced into evidence at trial.

DAVID HIRSHON, ESQ.
PO BOX 15060
PORTLAND, ME 04112-5060

DAVID SHERMAN, ESQ.
PO BOX 9781
PORTLAND, ME 04104-5081