MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2014 ME 137
Docket:        BCD-14-43
Argued:        November 6, 2014
Decided:       December 9, 2014

Panel:         SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, JABAR, and HJELM,
               JJ.


TESTA'S, INC.

v.

JACK COOPERSMITH et al.


SILVER, J.

[¶1]   Testa's, Inc., appeals from a judgment entered in the Business and Consumer Docket (*Nivison, J.*) after a bench trial, finding that a 1978 agreement granted an appurtenant easement over property belonging to Testa's for the benefit of Jack and Sherri Coopersmith's predecessors-in-title.   Testa's contends that the court erred in concluding that (1) the 1978 agreement was enforceable and created an easement, and (2) alternatively, the Coopersmiths have a prescriptive easement over the Testa's property.   We affirm the judgment.

## I.  BACKGROUND

[¶2]   Based on the evidence presented at trial, the court found the following facts.  Both parties own property on the westerly side of Main Street in Bar Harbor. Testa's owns several contiguous parcels, including a restaurant and a large parking

2

lot behind the buildings on Main Street, and Jack and Sherri Coopersmith own two contiguous parcels that abut the Testa's parking lot. The Coopersmiths' parcels comprise retail jewelry businesses and upstairs rental properties with space for parking behind the buildings. The Coopersmiths' southerly parcel (the Coopersmith building) abuts the Testa's parking lot to the north and east, and the rear of their northerly parcel (the Tourmaline building) abuts the Testa's parking lot to the east.[1]

[¶3] Between the 1950s and 1970s, the Coopersmiths' predecessors-in-title accessed the rear of their properties for business deliveries and other purposes via an area behind Main Street known as the "backyard," which Testa's owns. In the 1970s, the predecessors-in-title to Testa's, Joseph and Michele Testa, made plans to expand the parking lot behind the buildings on Main Street. The plans included building a concrete retaining wall that would block the Coopersmiths' predecessors-in-title from accessing the rear of their property. At that time, Phillip and Nathan Sanborn owned the Coopersmith building and Catherine Riccardo owned the Tourmaline building. After learning of the planned construction, the Sanborns, together with Riccardo and Joan Purcell,[2] sued the Testas on

---

[1] The Coopersmiths own one parcel in their names and the other in the name of their LLCs, Tourmaline King, LLC and Tourmaline Queen, LLC.

[2] Joan Purcell, Riccardo's daughter, operated an art gallery in the Tourmaline building. Purcell originally bought the Tourmaline building with her husband but transferred the property to her mother

September 9, 1977. The complaint alleged that the construction would prevent the access to the rear of their property that they and their predecessors historically had. The court granted a temporary restraining order that same day, prohibiting the Testas from interfering with the plaintiffs' access to the rear of their buildings.

[¶4] Through their attorneys, the parties eventually negotiated a written agreement in June 1978. The Testas agreed that both Riccardo and Sanborn "shall have access by foot or motor vehicle over lands of Testa to the westerly side of" their land. The agreement provided that in the event the Testas built a fence or installed a gate that "in any way imped[ed] said access over land of Testa to land of Sanborn or Riccardo," the Testas "shall provide" tokens or keys to access the gate. In other words, if the Testas proceeded with the construction of the retaining wall, the Sanborns and Riccardo would have access to the rear of their properties through a different route. The keys and tokens were to be used by "Riccardo, Sanborn, their immediate families, for delivery purposes or persons occupying said land of Sanborn and Riccardo under a written lease." Abuse of that access would terminate the agreement.

[¶5] Four people—Joseph Testa, Michele Testa, Philip Sanborn, and Nathan Sanborn—signed the agreement in June 1978. The fifth party, Catherine Riccardo,

---

after her husband faced potential liability following a car accident in 1971. Riccardo conveyed the building back to Purcell in 1984.

4

never signed the agreement. The Testas subsequently expanded the parking lot, built the concrete retaining wall, and installed a gate. The Sanborns and Joan Purcell then consistently accessed the rear of their properties through the gate (and over the parking lot) using tokens provided by the Testas. The lawsuit was dismissed for lack of prosecution in October 1980, and the agreement was recorded in the Hancock County Registry of Deeds in February 1981. The Testas removed the token-operated gates in May 1993.

[¶6] The Coopersmiths bought the Coopersmith building in 2005. In 2010, the town of Bar Harbor passed an ordinance providing that businesses were no longer required to have minimum parking space available for customers, making the Testa's parking lot available for development. Testa's sued the Coopersmiths and Joan Purcell on May 28, 2010, seeking a declaratory judgment that the Coopersmiths do not have a right of way over its property. The Coopersmiths counterclaimed, arguing that they have an express, prescriptive, or implied easement over Testa's property. Purcell, from whom the Coopersmiths had previously rented, conveyed the Tourmaline building to the Coopersmiths on December 24, 2012.

[¶7] The case was transferred to the Business and Consumer Docket and a three-day bench trial was held September 9-11, 2013. On October 1, 2013, the court entered judgment, finding that the 1978 agreement granted an appurtenant

easement over the Testa's property to the rear of the Coopersmith and Tourmaline buildings. After discussing post-trial motions with the parties, the court issued a superseding final decision and judgment on November 22, 2013. It addressed additional issues and found that (1) the statute of frauds did not bar the 1978 agreement, (2) the agreement did not convey a mere license, (3) the Coopersmiths did not abuse the easement, (4) the Coopersmiths alternatively had a prescriptive easement over Testa's property, and (5) the Coopersmiths did not have an implied easement. On January 6, 2014, the court denied motions by Testa's for a new trial and to alter or amend the final judgment. It granted in part a motion by Testa's for findings of fact and conclusions of law and amended the judgment to provide a more specific description of the Coopersmiths' easement over the Testa's property. Testa's timely appealed.

## II.  DISCUSSION

A.     The Enforceability of the 1978 Agreement

[¶8]  Testa's argues that the 1978 agreement is unenforceable because one of the five parties, Catherine Riccardo, did not sign it.  "A contract exists when the parties mutually assent to be bound by all its material terms, the assent is either expressly or impliedly manifested in the contract, and the contract is sufficiently definite."  *McClare v. Rocha*, 2014 ME 4, ¶ 16, 86 A.3d 22 (quotation marks omitted).  The existence of an enforceable contract is a question of fact that we

6

review for clear error. *See Thurston v. Galvin*, 2014 ME 76, ¶ 11, 94 A.3d 16; *McClare*, 2014 ME 4, ¶ 16, 86 A.3d 22 ("Whether a contract exists, the intent of the parties in entering into a contract, and whether a breach occurred are questions of fact."). We will affirm a trial court's findings of fact if they are supported by competent record evidence, and we "examine the record, and the reasonable inferences that may be drawn from the record, in the light most favorable to the trial court's judgment." *Pelletier v. Pelletier*, 2012 ME 15, ¶ 13, 36 A.3d 903 (quotation marks omitted).

[¶9] There was no error here under our deferential standard of review noted in *Pelletier*. First, the court properly found that Riccardo's signature was unnecessary to establish a binding agreement between the Testas and the Sanborns as to the Coopersmith building. The Testas and the Sanborns were the only parties necessary to come to agreement regarding access over the Testas' parking lot for the benefit of the Coopersmith building. Second, the trial court's finding that Riccardo consented to the terms of the 1978 agreement is not clearly erroneous. Riccardo's daughter, Joan Purcell, testified that she conveyed the Tourmaline building to her mother in order to protect the asset—in other words, Riccardo was an owner "in name only" and it was Purcell, not Riccardo, who occupied the property. Purcell testified that she understood that the 1978 agreement allowed her to access her parking area behind the Tourmaline building over the Testa's parking

lot.  The court found no evidence that Riccardo (or anyone else) had concerns about the terms of the agreement.  Purcell consistently accessed the Tourmaline property in accordance with the agreement and without objection from the Testas.  Based on these particular facts, the court did not clearly err in concluding that Riccardo's failure to sign the agreement was not the result of any objection she had to it.  The 1978 agreement, which both Testas signed and the parties followed for many years, is valid and enforceable.

B.     The Scope of the 1978 Agreement

[¶10]  Testa's argues that the 1978 agreement could reasonably be read to convey only a license, and not an easement, and is therefore ambiguous.  It contends that the court erred in excluding the testimony of Douglas Chapman, Esq., the attorney who drafted the 1978 agreement.  Alternatively, Testa's asserts that the agreement unambiguously granted a license rather than an appurtenant easement.

[¶11]  "The construction of language creating an easement is a question of law.  If the language . . . is ambiguous, however, extrinsic evidence may be considered to determine the intent of the parties." *Anchors v. Manter*, 1998 ME 152, ¶ 16, 714 A.2d 134 (citation omitted); *see Laux v. Harrington*, 2012 ME 18, ¶ 11, 38 A.3d 318 ("[T]he scope of a party's easement rights must be determined from the unambiguous language on the face of the deed.  Only if

language in a deed is ambiguous may a court consider extrinsic evidence to determine the intent of the parties." (quotation marks omitted)). We review de novo whether language in a contract is ambiguous. *Id.* "If we determine that [a] contract is unambiguous, then its interpretation is also a question of law. On the other hand, if the contract is ambiguous, then its interpretation is a question of fact for the factfinder," in which case we review the trial court's conclusion for clear error. *Am. Prot. Ins. Co. v. Acadia Ins. Co.*, 2003 ME 6, ¶ 11, 814 A.2d 989 (citation and quotation marks omitted).

[¶12] Generally speaking, "[a]n easement is a right of use over the property of another." *Stickney v. City of Saco*, 2001 ME 69, ¶ 31, 770 A.2d 592; *see Marvin M. Brandt Revocable Trust v. United States*, 134 S. Ct. 1257, 1265 (2014) ("An easement is a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement." (quotation marks omitted)). The law recognizes two general types of easements: appurtenant and in gross. *Stickney*, 2001 ME 69, ¶ 31, 770 A.2d 592. An appurtenant easement, which must be attached or related to a dominant estate, entitles the dominant estate's owner to the use of a servient estate's land in some manner. *See id.* Appurtenant easements run with the land. *Id.* "In contrast, easements in gross are personal interests in land or the right to use another's land. They are not appurtenant to any estate in land and do not belong to any person by

virtue of his ownership of an estate in other land." *Wentworth v. Sebra*, 2003 ME 97, ¶ 13, 829 A.2d 520 (citation and quotation marks omitted).

[¶13] An easement may also be subject to defeasance based upon the occurrence of a future event. *See Eis v. Meyer*, 555 A.2d 994, 996 (Conn. App. Ct. 1989), *aff'd*, 566 A.2d 422 (Conn. 1989) ("[A]n easement may be created which will terminate upon the happening of an event or contingency, or which may be terminated on the occurrence, [or] breach . . . of a condition . . . and the limitation or condition will ordinarily be enforced unless it is not sufficiently definite . . . or is contrary to law or public policy." (quotation marks omitted) (alterations in original)); *Rollins v. Blackden*, 99 Me. 21, 25, 58 A. 69 (1904) (describing as determinable the "grant of the right to draw water from [a] well" because it would be terminated upon sale of the land bearing the well).[3]

[¶14] A license, on the other hand, is a "personal privilege to do an act or acts in relation to another's land." *Reed v. A. C. McLoon & Co.*, 311 A.2d 548, 552 (Me. 1973). Unlike an easement, "[a] license creates no interest in land, may be created orally, and is revocable, unless coupled with an interest."

---

[3] *See also Akasu v. Power*, 91 N.E.2d 224, 226 (Mass. 1950) ("An easement may be granted which will terminate upon the happening of some particular act or upon the non-performance of a condition subsequent."); *The Law of Easements & Licenses in Land* § 10:3 (2014) ("A defeasible easement may be structured in such a way that the easement either (1) ends automatically upon the happening of the stated event, in which case it is a determinable easement, or (2) is subject to termination by an affirmative act of the servient estate owner whenever the specified event occurs, in which case it is an easement subject to a condition subsequent." (footnotes omitted) (citing cases)).

10

*Id.* n.7. An easement is therefore "of more permanent character" than a license. *Id.*; *see, e.g.*, *Waterville Estates Ass'n v. Town of Campton*, 446 A.2d 1167, 1169 (N.H. 1982) (describing a license as "a transient or impermanent interest").

[¶15] In issuing its decision, the trial court acknowledged that both of the parties' experts had opined that, if the agreement were valid, its language conveyed an appurtenant easement. We agree. It granted an appurtenant easement over the Testas' parking lot for the benefit of Riccardo's and the Sanborns' buildings. As the plain language of the agreement states, the Testas agreed that both Riccardo and the Sanborns "shall have access by foot or motor vehicle over the lands of Testa" to the westerly and southerly sides of their respective parcels. The agreement "confers more than a revocable, temporary right to act," *Reed*, 311 A.2d at 552—it guarantees open-ended access after the installation of a fence and token-operated gates. With the construction of the concrete retaining wall, the Sanborns and Riccardo (and Purcell) would have no other way to reach the rear of their properties. The agreement clearly "benefit[s] a dominant estate," *Wentworth*, 2003 ME 97, ¶ 12, 829 A.2d 520—two estates, in this case—and is subject to termination only upon abuse.

[¶16] Testa's relies on the termination language to argue that the agreement could be read to convey a license and is therefore ambiguous. Alternatively, it argues that the agreement unambiguously granted a license. But unlike a license,

the 1978 agreement is not revocable at will. *See, e.g.*, *The Law of Easements & Licenses in Land* § 1:5 (2014) ("Specifying a power to terminate for a particular reason or in limited circumstances may be seen as inconsistent with the unabridged right to revoke retained by one who grants a license. Moreover, an easement may be expressly subject to termination by the servient owner upon the occurrence of a specified event." (footnotes omitted)); *Riverwood Commercial Park, LLC v. Standard Oil Co.*, 797 N.W.2d 770, 777 (N.D. 2011) (finding that a "permit constituted an easement," not a license, because it "is not revocable at the will of the landowner, but is subject to termination only under limited circumstances"). That the access was structured to end upon the happening of a "specified event" in the agreement—abuse of the access—does not transform it into a license. *The Law of Easements & Licenses in Land* § 10:3 (2014); *see Akasu v. Power*, 91 N.E.2d 224, 226 (Mass. 1950). In its amended judgment, the trial court found that the Coopersmiths had not abused the easement and Testa's does not appeal that finding here.

[¶17]   For these reasons, the court did not err in determining that the language of the 1978 agreement unambiguously granted an appurtenant easement and excluding Chapman's testimony. *See Sleeper v. Loring*, 2013 ME 112, ¶ 16, 83 A.3d 769 ("When interpreting a deed whose terms are not ambiguous, we do

12

not speculate about the grantors' actual or probable objectives; rather, we focus on what is expressed within the four corners of the deed.").

## III. CONCLUSION

[¶18]   The trial court properly concluded that the 1978 agreement (1) is enforceable against Testa's and (2) granted an appurtenant easement.  Because of our holding, we do not reach the parties' prescriptive-easement arguments.

The entry is:

Judgment affirmed.

**On the briefs:**

Aaron K. Baltes, Esq., Norman, Hanson & DeTroy, LLC, Portland, for appellant Testa's, Inc.

David A. Soley, Esq., and Glenn Israel, Esq., Bernstein, Shur, Sawyer & Nelson, Portland, for appellees Jack N. Coopersmith, Sherri L. Coopersmith, Tourmaline King, LLC, and Tourmaline Queen, LLC

Gerald O. Fournier, Esq., Richardson, Whitman, Large and Badger, Bangor, for appellees Jack N. Coopersmith and Sherri L. Coopersmith

**At oral argument:**

Aaron K. Baltes Esq., for appellant Testa's, Inc.

David Soley for appellees Jack N. Coopersmith, Sherri L. Coopersmith, Tourmaline King, LLC, and Tourmaline Queen, LLC