MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2022 ME 28
Docket:       Lin-21-266
Argued:       March 8, 2022
Decided:      May 24, 2022

Panel:        STANFILL, C.J., and MEAD, HUMPHREY, HORTON, and CONNORS, JJ.*

## 55 OAK STREET LLC

v.

## RDR ENTERPRISES, INC.

CONNORS, J.

[¶1]  A commercial landlord, 55 Oak Street LLC, appeals from a judgment of the Superior Court (Lincoln County, *Billings, J.*) affirming a judgment of the District Court (Wiscasset, *Martin, J.*) that denied Oak Street's forcible entry and detainer (FED) action to oust its tenant, RDR Enterprises, Inc., from possession of Oak Street's property.  The District Court concluded that Oak Street was not entitled to possession because RDR Enterprises' failure to pay its rent was at least partially excused by the force majeure clause in the parties' lease.  We agree with Oak Street that RDR Enterprises' breach of the terms of its lease

---

* Although Justice Gorman participated in the appeal, she retired before this opinion was certified.

entitled Oak Street to issuance of a writ of possession, and we therefore vacate the judgment. *See* 14 M.R.S. §§ 6005, 6017(2), (3) (2022).

## I. BACKGROUND

[¶2] The following facts and procedural history are drawn from the record and the trial court's findings of fact, which are supported by competent evidence in the record. *See H&B Realty, LLC v. JJ Cars, LLC*, 2021 ME 14, ¶ 2, 246 A.3d 1176.

[¶3] On April 1, 2017, Oak Street and RDR Enterprises entered into a five-year lease agreement, with RDR Enterprises' option to extend, for a bed-and-breakfast establishment, the Thistle Inn, located in Boothbay Harbor. The Thistle Inn contains a restaurant space that can seat up to ninety-nine people.

[¶4] Under the lease agreement, RDR Enterprises is required to pay Oak Street a "base rent" of $2,500 per month and an "additional rent" covering all property taxes, insurance, and utilities. The lease includes a force majeure clause, which states:

> **FORCE MAJEURE.** Neither party hereto will be liable for any failure to comply or delay in complying with its obligations hereunder if such failure or delay is, including but not limited to, due to acts of God, inability to obtain labor, strikes, lockouts, lack of materials, governmental restrictions, enemy actions, civil commotion, fire, unavoidable casualty or other similar causes

beyond such party's reasonable control (all of which events are herein referred to as "Force Majeure Events"). It is expressly agreed that neither party will be obliged to settle any strike to avoid a Force Majeure Event from continuing.

For three years, RDR Enterprises operated the Thistle Inn in full compliance with the lease.

[¶5] On March 18, 2020, Governor Mills issued an executive order designed to reduce the spread of COVID-19. *See* Me. Exec. Order No. 14 FY 19/20 (Mar. 20, 2020). In relevant part, the order provided that "[a]ll restaurants and bars shall close their dine-in facilities" until March 31, 2020, and that "eating and drinking inside restaurants and bars is temporarily prohibited." *Id.* The order was later extended to preclude indoor dining through May 31, 2020. *See* Me. Exec. Order No. 19-A FY 19/20 (Apr. 7, 2020); Me. Exec. Order No. 28 FY 19/20 (Mar. 31, 2020); Me Exec. Order No. 49 FY 19/20 (Apr. 29, 2020).

[¶6] As required by the executive orders, RDR Enterprises closed the Thistle Inn's indoor restaurant on March 18, 2020. The Thistle Inn had never offered carry-out, delivery, or drive-through services, and it did not begin offering those services during the pandemic. After the executive order went

4

into effect and the Thistle Inn closed, RDR Enterprises largely stopped paying rent to Oak Street for the restaurant portion of the Thistle Inn.[1]

[¶7] On April 28, 2020, the Governor published a pandemic management plan that the parties agree permitted indoor dining on a restricted basis starting on June 1, 2020, as long as capacity and social-distancing guidelines were followed. *See* State of Me. Off. of the Governor, *Restarting Maine's Economy* (Apr. 28, 2020), https://www.maine.gov/covid19/restartingmaine/april. Consequently, it would have been possible for RDR Enterprises to open the Thistle Inn on June 1, 2020,[2] although only approximately thirty-five guests could be seated indoors at any one time due to the social distancing requirements. RDR Enterprises, however, decided not to open the Thistle Inn for indoor dining because it believed that such a partial reopening would be a poor financial decision and would not "create longevity for [its] business."

[¶8] On June 26, 2020, Oak Street sent a letter to RDR Enterprises notifying it that it was in "terminable default" of the lease agreement because

---

[1] RDR Enterprises made a partial payment toward the restaurant rent for April 2020 and fully paid the rent for July 2020. The rent payments for the hotel portion of the Thistle Inn are paid separately and are not at issue in this case.

[2] The pandemic management plan permitted restaurants in Lincoln County to open for indoor dining in May 2020, *see* State of Me. Off. of the Governor, *Restarting Maine's Economy* (Apr. 28, 2020), https://www.maine.gov/covid19/restartingmaine/april; the parties agree that the Thistle Inn would have been able to open on June 1, 2020. This is likely because the executive order prohibiting indoor dining was set to expire on May 31, 2020. *See* Me Exec. Order No. 49 FY 19/20 (Apr. 29, 2020).

of its failure to pay rent.  On August 20, 2020, after attempts to reach a resolution, Oak Street sent RDR Enterprises a notice of default and termination. In the notice, Oak Street stated that the lease was "hereby terminated immediately" and that RDR Enterprises had to vacate the premises.  Oak Street also sought payment of the overdue rent for the months of April, May, June, and August.  In the subsequent months, RDR Enterprises did not pay the overdue rent or vacate the Thistle Inn.

[¶9]  Oak Street filed this FED action on October 14, 2020.  As required by statute, RDR Enterprises deposited the disputed unpaid rent with the District Court.  *See* 14 M.R.S. § 6017(2).

[¶10]  The District Court held a hearing on the complaint the following month.  The parties agreed that the disputed rent totaled to $19,685.03.  The primary contested issue was whether the lease's force majeure clause excused RDR Enterprises' obligation to pay rent.

[¶11]  On December 15, 2020, the District Court issued a judgment determining that RDR Enterprises was excused from its contractual obligation to pay any rent between March 18, 2020, and May 31, 2020, because the Governor's executive orders completely prohibiting indoor dining constituted a "governmental restriction[]" force majeure event within the meaning of the

lease's force majeure clause. The District Court concluded that for the period after May 31, 2020, when restricted indoor dining was permitted, the "pandemic itself constitutes a force majeure event and, therefore, would excuse RDR's performance under the lease agreement, at least in part." (Italics omitted.) Taking guidance from *In re Hitz Restaurant Group*, 616 B.R. 374, 378-79 (Bankr. N.D. Ill. 2020), the District Court discounted the rent owed by RDR Enterprises to 40 percent of the lease amount based on its finding that RDR Enterprises would have been able to operate the Thistle Inn at approximately 40 percent capacity under the indoor dining restrictions. The District Court then denied Oak Street possession, concluding that "RDR ha[d] not breached the terms of the lease as its obligations to pay . . . rent are either entirely excused or partially excused."

[¶12] Oak Street appealed to the Superior Court, *see* 14 M.R.S. §§ 6008(1), 6017(2) (2022); M.R. Civ. P. 80D(f), which affirmed the judgment after receiving supplemental briefing on whether Oak Street was entitled to possession of the property. Oak Street timely appealed to us. *See* 14 M.R.S. § 1851 (2022); M.R. App. P. 2B(c)(1); M.R. Civ. P. 80D(f)(1).

## II.  DISCUSSION[3]

[¶13]  In an FED action, the landlord is entitled to possession if it can show that the tenant's violation of the lease's terms has resulted in forfeiture or termination of the lease.  *See* 14 M.R.S. § 6001(1) (2022); *Rubin v. Josephson*, 478 A.2d 665, 668-69 (Me. 1984); 2 Richard R. Powell, *Powell on Real Property* § 17.02[1][a][ii] at 17-9 (Michael Allan Wolf ed., Matthew Bender 2005).  If the landlord shows that the tenant's default has terminated the lease, the landlord is entitled to a writ of possession.  *See* 14 M.R.S. §§ 6005, 6017(2), (3).

---

[3]  Oak Street argues that there was no causal link between the force majeure event(s) and RDR Enterprises' inability to pay rent.  Because we conclude that the District Court erred as a matter of law in interpreting the contract, we need not reach this argument.  We note, however, that most courts that have addressed the issue of proximate cause in the context of the COVID-19 pandemic have required more than a barebones connection between the alleged force majeure event and a party's inability to pay rent.  *See* Timothy Murray, *Corbin on Contracts: Force Majeure and Impossibility of Performance Resulting from COVID-19* § 1.03[2][D] (2021) ("Simply positing two facts—that the pandemic has occurred, and that a party finds it very difficult or even impossible to perform its contractual obligations—is not enough."); *Palm Springs Mile Assocs. v. Kirkland's Stores, Inc.*, No. 20-21724-Civ-Scola, 2020 U.S. Dist. LEXIS 163880, at *5 (S.D. Fla. Sept. 9, 2020) ("Kirkland fails to explain how the governmental regulations it describes as a force majeure event *resulted in* its inability to pay its rent."); *Future St. Ltd. v. Big Belly Solar, LLC*, No. 20-cv-11020-DJC, 2020 U.S. Dist. LEXIS 136999, at *20 (D. Mass. July 31, 2020) ("Even assuming *arguendo* that the pandemic and effects of [the] same are a force majeure[,] . . . Future Street has not shown that its failure to perform its obligations under the Agreement were caused by [the] same."); *see also In re Cinemex USA Real Est. Holdings, Inc.*, 627 B.R. 693, 701 & n.17 (Bankr. S.D. Fla. 2021) (concluding that a theater's decision not to open due to economic concerns created by the COVID-19 pandemic did not excuse the theater's nonperformance under the doctrine of frustration of purpose).  Also, here, the District Court expressly found that because RDR Enterprises could have resumed indoor dining service on a limited basis in June 2020, "its obligation to pay rent is not excused by the force majeure clause, at least entirely."  This finding would appear to indicate that the indoor dining restrictions were not the proximate cause of RDR Enterprises' inability to pay rent.

Additionally, although RDR Enterprises requests that we award attorney fees to the prevailing party as contemplated by the lease, the FED statute does not authorize courts to award attorney fees.  *See 20 Thames St. LLC v. Ocean State Job Lot of Me. 2017, LLC*, 2020 ME 55, ¶ 12, 231 A.3d 426.

[¶14]  The only issue before us on appeal is whether Oak Street is entitled to possession of the Thistle Inn property based on RDR Enterprises' failure to pay rent after May 31, 2020.[4]

[¶15]  In cases involving the interpretation of contract language, the proper standard of review depends on whether the contract language at issue is ambiguous, which we determine de novo.  *See Testa's, Inc. v. Coopersmith*, 2014 ME 137, ¶ 11, 105 A.3d 1037.  "Contract language is ambiguous when it is reasonably susceptible of different interpretations." *Am. Prot. Ins. v. Acadia Ins.*, 2003 ME 6, ¶ 11, 814 A.2d 989 (quotation marks omitted).  If a contract is ambiguous, this Court reviews the interpretation of the contract for clear error by the fact finder.  *See Villas by the Sea Owners Ass'n v. Garrity*, 2000 ME 48, ¶ 9, 748 A.2d 457; *see also Testa's, Inc.*, 2014 ME 137, ¶ 11, 105 A.3d 1037.  If a contract is unambiguous, this Court reviews its language de novo.  *See Spottiswoode v. Levine*, 1999 ME 79, ¶ 25, 730 A.2d 166; *see also Testa's, Inc.*, 2014 ME 137, ¶ 11, 105 A.3d 1037.

---

[4]  Oak Street does not challenge the trial court's finding that RDR Enterprises' obligation to pay rent to Oak Street was excused during the period when no indoor dining was allowed.  We also do not address whether the District Court erred in deciding that RDR Enterprises was only required to pay 40 percent of the outstanding rent due after May 31, 2020, because, at oral argument, Oak Street indicated that it was only seeking a writ of possession and waived any challenge to the amount of rent ordered.  *See State v. Goodridge*, 556 A.2d 211, 212 n.3 (Me. 1989).

[¶16]  On an appeal from the Superior Court, we review the District Court's judgment directly if the Superior Court acted in an appellate capacity. *See Fleet Bank of Me. v. Griffin*, 1997 ME 45, ¶ 4, 690 A.2d 981.

## A.  The plain language of the lease does not excuse nonperformance based on the concept of a "partial" force majeure event.

[¶17]  The District Court denied Oak Street's complaint because it read the lease's force majeure clause as partially excusing RDR Enterprises' obligation to pay rent and concluded that RDR Enterprises did not breach the terms of the lease.  This conclusion, however, is contrary to the unambiguous terms of the lease.

[¶18]  "A 'force majeure' is an unanticipated and uncontrollable event, including an act of nature such as a flood, tornado, or hurricane." *Opinion of the Justices*, 2015 ME 107, ¶ 77 n.26, 123 A.3d 494.  A force majeure clause is a provision in a contract providing that certain supervening events may excuse a party's performance obligations.  *See* 14 Timothy Murray, *Corbin on Contracts* § 74.19 (2021).  Unless otherwise indicated by the contract, the party seeking to have its nonperformance excused by the force majeure clause bears the burden of proof.  *See Hansen v. Sunday River Skiway Corp.*, 1999 ME 45, ¶ 11 n.2, 726 A.2d 220 ("Generally[,] the party opposing a claim, usually a defendant, has the burden of proof on an issue characterized as an affirmative defense or other

issues to avoid or reduce liability."); *see also Moore v. Jet Stream Invs., Ltd.*, 261 S.W.3d 412, 420 (Tex. App. 2008); *Phillips P.R. Core, Inc. v. Tradax Petroleum Ltd.*, 782 F.2d 314, 319 (2d Cir. 1985); *Gulf Oil Corp. v. Fed. Energy Reg. Comm'n*, 706 F.2d 444, 452 (3d Cir. 1983).

[¶19]  Whether a force majeure clause applies to excuse a party's performance depends on the clause's language.  *See Cohen v. Morneault*, 120 Me. 358, 360, 114 A. 307 (1921) ("[A] contract may . . . be so expressly qualified that impossibility of performance resulting from some unforeseen accident will constitute a complete defense; or it may be impliedly so qualified. It depends on the intention of the parties as disclosed by the contract."); *Zurich Am. Ins. v. Hunt Petroleum (AEC) Inc.*, 157 S.W.3d 462, 466 (Tex. App. 2004) ("Regardless of its historical underpinnings, the scope and application of a force majeure clause depend on the terms of the contract.").

[¶20]  Because it has not been challenged on appeal, we accept the District Court's conclusion that the pandemic or the Governor's executive orders completely prohibiting indoor dining until June 1, 2020, fall within the language of the force majeure clause as an "act[] of God" and "governmental restrictions."  Beginning on June 1, 2020, however, the force majeure clause does not apply to partially excuse RDR Enterprises' duty to pay rent because

the unambiguous language of the clause (1) contains no indication that it can apply to partially excuse a party's nonperformance and (2) does not excuse a party's nonperformance based on governmental restrictions that limit the party's ability to make a profit, rather than preventing the party from carrying out the use contemplated by the contract.

[¶21]   The clause does not include any language incorporating the concept of "partial" force majeure or partial rent payments based on a force majeure event.   To the contrary, the clause provides that protection from default for nonperformance only applies if "such" nonperformance was due to a force majeure event.   This language indicates that either nonperformance is excused by the force majeure clause or it is not excused—it provides no support for the District Court's conclusion that some, but not all, of RDR Enterprises' nonperformance was excused by the partial shutdown.

[¶22]  The trial court, moreover, expressly found that the Thistle Inn was capable of operating at a reduced capacity on June 1, 2020, but that RDR Enterprises chose not to do so because of concerns about the economic viability of such an opening.   RDR Enterprises' decision was not compelled by the pandemic or governmental restrictions: instead, as noted by the trial court, it was an *economic decision* based on concerns about the financial feasibility of a

12

partial opening.  Nothing in the language of the clause indicates that events affecting economic viability constitute force majeure events.  Such an interpretation would go against the weight of force majeure law because, as a general matter, events causing economic hardship, such as market downturns, do not constitute force majeure events unless specifically designated in the contract.  *See, e.g.*, *In re Millers Cove Energy Co.*, 62 F.3d 155, 158-59 (6th Cir. 1995); *B.F. Goodrich Co. v. Vinyltech Corp.*, 711 F. Supp. 1513, 1518-19 (D. Ariz. 1989); *Stand Energy Corp. v. Cinergy Servs., Inc.*, 760 N.E.2d 453, 457 (Ohio Ct. App. 2001).

[¶23]  Accordingly, the District Court's partial-excuse ruling cannot be sustained under the language of this force majeure clause.[5]  In the absence of express contractual language, we do not read into a force majeure clause the concept of a "partial" excuse for nonperformance based on events such as the issuance of executive orders that reduce seating capacity.[6]

---

[5] Viewing the lease agreement as a whole, *see Am. Prot. Ins. v. Acadia Ins.*, 2003 ME 6, ¶¶ 11-12, 814 A.2d 989, we note that there is another indication that the parties did not intend for a force majeure to partially excuse a party's nonperformance. Section 19(b) of the lease agreement provides that, in the case of a partial government taking of the property, the tenant, at its election, may terminate the lease.  The section does not provide that either party's performance is partially excused in the event of a partial taking if the tenant does not so elect.

[6] Although the express language of a force majeure clause supersedes the application of common law contractual doctrines such as frustration of purpose or impracticability of performance, *see Wis. Elec. Power Co. v. Union Pac. R.R. Co.*, 557 F.3d 504, 506-07 (7th Cir. 2009); *Commonwealth Edison Co. v. Allied-General Nuclear Servs.*, 731 F. Supp. 850, 855 (N.D. Ill. 1990), we note that our reading of the lease language at issue here is consistent with those doctrines, which do not partially excuse

## B.    Oak Street is entitled to possession.[7]

[¶24]   Given the unambiguous language of the lease's default clause, which provides that nonpayment of rent justifies termination of the lease, the lease was properly terminated, and the trial court erred in concluding otherwise and not granting Oak Street possession of the property.[8]

---

performance based on events that simply diminish profits. *See Bouchard v. Blunt*, 579 A.2d 261, 263 n.3 (Me. 1990) (concluding that additional costs did not render performance impracticable); *Hoyt v. Tapley*, 121 Me. 239, 247-48, 116 A. 559 (1922) (affirming a jury verdict based on the failure of the defendant to deliver potatoes and rejecting the argument that weather conditions rendered performance impossible because "[t]he rule that if a thing becomes physically impossible by the act of God, performance is excused, does not prevail, when the essential purpose of the contract may be accomplished"); *Elsemore v. Inhabitants of Hancock*, 137 Me. 243, 249, 18 A.2d 692 (1941) (citing with approval authority in which a school shutdown due to contagious disease did not excuse the school from its contractual obligation to pay a teacher); *Cohen v. Morneault*, 120 Me. 358, 361-62, 114 A. 307 (1921) (destruction of one source of potatoes to fulfill a contractual obligation did not relieve the supplier of its obligation to perform). *See generally* 14 Timothy Murray, *Corbin on Contracts* § 77.4 (2021) ("To justify a discharge, the lessee must show that the frustration of purpose is severe. Inconvenience, unprofitability, and unexpected income reductions or cost increases will usually not suffice."); Timothy Murray, *Corbin on Contracts: Force Majeure and Impossibility of Performance Resulting from COVID-19* § 1.03[2][D] ("If the business has not been totally shut down, most COVID-19 decisions handed down during the first year of the pandemic have not afforded relief.").

[7] RDR Enterprises argues that Oak Street may not challenge the District Court's decision as to which party is entitled to possession of the property because it claims that Oak Street waived that challenge by not raising the issue of possession at the hearing before the District Court. This issue was directly before the District Court, however, because, under the FED statute for commercial leases, the District Court decides "the right of possession" and "the amount of rent owed." 14 M.R.S. § 6017(2) (2022). Determining whether there has been a breach of the lease agreement and which party is entitled to immediate possession of the property is the primary function of the District Court in an FED case. *See Tozier v. Tozier*, 437 A.2d 645, 647 (Me. 1981); *see also* 14 M.R.S. § 6001(1) (2022); *Rubin v. Josephson*, 478 A.2d 665, 667 (Me. 1984). Accordingly, the issue of whether RDR Enterprises' failure to pay rent results in termination of the lease is properly before us.

[8] RDR Enterprises further argues that it did not breach the lease because the force majeure clause allows for delayed performance when a force majeure event has occurred and that it paid rent, albeit later than expected, when the District Court awarded Oak Street 40 percent of the disputed rent from the bond that RDR Enterprises had posted. But it was not until after Oak Street had sent a notice of termination and sought a remedy through the courts that the rent was paid. RDR Enterprises cites no authority for the proposition that an award of disputed rent after litigation from the bond required

14

[¶25] The District Court may well have acted with the laudable goal of reaching a Solomonic resolution in light of the difficult realities of the COVID-19 pandemic. We hope that, going forward, parties will compromise in situations like these instead of resorting to litigation. But the District Court's interpretation of the force majeure clause goes against its plain language, and the lease clearly provides that failure to perform results in a default justifying termination.[9] As such, RDR Enterprises is entitled to possession.[10]

---

by statute can be considered delayed compliance with a contractual obligation to pay rent. When a party to a contract owes the other party a sum per the terms of the contract, the fact that the other party eventually obtains the amount due through enforcement of a judgment does not mean that the nonpaying party did not breach the contract.

[9] As support for its ruling embracing the concept of partial force majeure, the trial court cited a bankruptcy court's decision in *In re Hitz Restaurant Group*, 616 B.R. 374, 378-79 (Bankr. N.D. Ill. 2020). The approach taken in *Hitz* is an outlier and has not been followed elsewhere. *See* Timothy Murray, *Corbin on Contracts: Force Majeure and Impossibility of Performance Resulting from COVID-19* § 1.03[2][B], [2][D], [3][B]; Robyn S. Lessans, Comment, *Force Majeure and the Coronavirus: Exposing the "Foreseeable" Clash Between Force Majeure's Common Law and Contractual Significance*, 80 Md. L. Rev. 799, 815 n.151 (2021). *Compare Hitz*, 616 B.R. at 378-79, *with In re Cinemex USA Real Est. Holdings, Inc.*, 627 B.R. at 701 & n.17 (concluding that a theater's decision not to open due to economic concerns created by the COVID-19 pandemic did not excuse the theater's nonperformance under the doctrine of frustration of purpose). The proceedings in *Hitz* also occurred in the context of a preliminary bankruptcy proceeding and not in the FED context, and, as such, the case is not entirely apposite. *See Hitz*, 616 B.R. at 380.

[10] Our conclusion that Oak Street is entitled to possession of the property is further supported by the fact that RDR Enterprises did not pay *any* of the rent owed. The language of the lease unambiguously provides that a failure to pay rent constitutes grounds for default of the lease. This means *all* the rent due. Hence, even if the concept of a partial excuse for nonperformance were applicable, nothing in the lease's force majeure clause—or any other part of the lease—indicates that the obligation to pay the amount due under the lease would be completely discharged when part of the tenant's duty to pay rent is excused by a force majeure event.

The entry is:

> Judgment vacated. Remanded to the Superior Court for remand to the District Court for entry of a judgment issuing a writ of possession to 55 Oak Street LLC.

---

Glenn Israel, Esq., and James G. Monteleone, Esq. (orally), Bernstein Shur, Portland, for appellant 55 Oak Street LLC

William Avantaggio, Esq. (orally), Damariscotta, and John Robinson, Jr., Esq., Walpole, for appellee RDR Enterprises, Inc.

Lincoln County Superior Court docket number AP-2021-01
FOR CLERK REFERENCE ONLY