MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:    2025 ME 86
Docket:      BCD-24-316
Argued:      April 10, 2025
Decided:     August 28, 2025

Panel:       STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

ANN CANNON et al.

v.

TOWN OF MOUNT DESERT et al.

MEAD, J.

[¶1]  Ann Cannon and six other property owners and part-time residents[1] in the village of Northeast Harbor (collectively the residents) appeal from a judgment entered in the Business and Consumer Docket (*McKeon, J.*) affirming a decision by the Town of Mount Desert Planning Board approving a subdivision application for a proposed six-dwelling-unit subdivision.  Because the Planning Board erroneously declined to calculate the open-space requirements provided for in the Town's Subdivision Ordinance, we vacate the judgment with an instruction for the court to remand the matter to the Planning Board for further consideration.

---

[1] The residents are Ann Cannon, Marc Cannon, Mellisa Cannon Guzy, Lamont Harris, Stuart Janney, Joseph Ryerson, and Lynne Wheat.

## I. BACKGROUND

[¶2]  The relevant facts are drawn from the Planning Board's findings, which are supported by the administrative record.  *See Gensheimer v. Town of Phippsburg*, 2005 ME 22, ¶ 17, 868 A.2d 161.

[¶3]  In March 2023, an entity called Mount Desert 365 (MD 365) submitted a subdivision application to the Town of Mount Desert's Planning Board for a six-dwelling-unit subdivision, called the Heel Way Subdivision, designed to serve the year-round workforce.  In its application, MD 365 sought to develop a 0.9-acre parcel of land in the village of Northeast Harbor, building two double-dwelling-unit buildings and two single-dwelling-unit buildings on a commonly owned lot.

[¶4]  In conducting its review, the Planning Board met a total of nine times, including at meetings where it heard from MD 365, adjacent residents, and the general public.  In October 2023, the Planning Board voted to approve MD 365's application.  In December 2023, the Planning Board issued a written decision with findings and conclusions of law.

[¶5] The residents sought judicial review in the Superior Court pursuant to M.R. Civ. P. 80B.  The case was subsequently transferred to the Business and Consumer Docket.  The court entered a judgment in June 2024, affirming the

Planning Board's decision.    The residents timely appealed.    M.R. App. P. 2B(c)(1); M.R. Civ. P. 80B(n).

## II.  DISCUSSION

### A.    Standard of Review

[¶6]  When the trial court acts as an appellate court, we directly review the Planning Board's decision.  *See Stewart v. Town of Sedgwick*, 2000 ME 157, ¶ 4, 757 A.2d 773.  "In conducting our review, we are limited to reviewing the record that was before the Planning Board, the operative decision maker." *Friends of Lamoine v. Town of Lamoine*, 2020 ME 70, ¶ 19, 234 A.3d 214.

[¶7]  The residents, as the parties seeking to vacate the Planning Board's decision, bear the burden of persuasion on appeal.  *See id.* ¶ 20.  We review ordinance language de novo with no deference to the Planning Board's interpretation.  *Stiff v. Town of Belgrade*, 2024 ME 68, ¶ 12, 322 A.3d 1167. "Although interpretation of an ordinance is a question of law, we accord substantial deference to a municipality's characterizations and fact-findings as to what meets ordinance standards."  *Fissmer v. Town of Cape Elizabeth*, 2017 ME 195, ¶ 13, 170 A.3d 797 (alteration and quotation marks omitted).  In analyzing an ordinance, "[w]e first determine if the language of the ordinance is plain and unambiguous" and "interpret the ordinance accordingly, unless the

4

result is illogical or absurd." *Portland Reg'l Chamber of Com. v. City of Portland*, 2021 ME 34, ¶ 23, 253 A.3d 586 (quotation marks omitted). "We construe words in an ordinance according to their plain meaning and construe undefined or ambiguous terms reasonably with regard to both the objects sought to be obtained and to the general structure of the ordinance as a whole." *Id.* ¶ 24 (quotation marks omitted).

## B. Access Road Requirements

[¶8] The Town of Mount Desert's Subdivision Ordinance requires developers to meet a series of robust standards "[w]here an access road from a public road or highway is required to serve 3 or more lots." Mount Desert, Me., Subdivision Ordinance § 5.14.1 (May 8, 2018). The Town of Mount Desert's Land Use Zoning Ordinance, which is incorporated by reference into the Town's Subdivision Ordinance, *see id.* § 2.2.3, requires developers to meet less robust standards for constructing a "driveway." Mount Desert, Me., Land Use Zoning Ordinance §§ 6B.6, 8 (May 3, 2022). MD 365's application proposed a single "driveway," rather than an "access road," to allow access to all six units. The Planning Board accepted this component of the application, concluding that the access-road standards did not apply because the Heel Way Subdivision would be "a single lot condominium style of developmental subdivision so there is no

street or road to be designed or constructed to serve three or more lots." The residents argue that the proposed plan would subdivide the property into six separate units, each constituting a "lot," and thus the Heel Way Subdivision must meet access-road requirements.

[¶9]  The Zoning Ordinance defines a "Lot" as

A parcel of land described on a deed, plot, or similar legal document, and is all contiguous land within the same ownership, provided that lands located on opposite sides of a public or private road shall be considered each a separate parcel or tract of land unless such road was established by the owner of land on both sides of the road thereof after September 22, 1971.

Mount Desert, Me., Land Use Zoning Ordinance § 8.  Distilled down, a "lot" is (1) a parcel of contiguous land, (2) described on a legal document, and (3) within the same ownership.

[¶10]  In considering whether a development subdivides land into separate lots, we have recognized a distinction between developments that create a division of interests in land and developments that create a division of interests only in a structure or structures.  *See Town of York v. Cragin*, 541 A.2d 932, 933-34 (Me. 1988) (holding that plans to construct a twenty-unit motel, convert a farmhouse and barn into a ten-unit condominium, and build a twelve-unit apartment building did not necessitate the division of a parcel of land into separate lots).  Moreover, 30-A M.R.S. § 4401(4) (2025) contemplates

6

both subdivisions that divide interests in land and subdivisions that divide interests in a structure or structures:

> "Subdivision" means the division of a tract or parcel of land into 3 or more lots within any 5-year period that begins on or after September 23, 1971. This definition applies whether the division is accomplished by sale, lease, development, buildings or otherwise. The term "subdivision" also includes the division of a new structure or structures on a tract or parcel of land into 3 or more dwelling units within a 5-year period, the construction or placement of 3 or more dwelling units on a single tract or parcel of land and the division of an existing structure or structures previously used for commercial or industrial use into 3 or more dwelling units within a 5-year period.

[¶11] We have recognized that there are circumstances when an owner's actions created a division of interests in land, thus creating separate lots. *See Town of Orrington v. Pease*, 660 A.2d 919, 921-22 (Me. 1995) (recognizing that a division of land into multiple lots occurred when an owner created a joint tenancy on a portion of his property and mortgaged a different portion of his property); *Town of Naples v. Michaud*, 444 A.2d 40, 42-44 (Me. 1982) (holding that a campground owner created multiple lots when he sold interests in his campground because "each purchaser receive[d] an indefinite fee interest in a unique and identifiable parcel of land").

[¶12] However, we have not announced a rigid rule providing that creating a subdivision with stand-alone units with separate building envelopes

necessarily creates separate interests in land. *But cf. Windward Dev., LLC v. Cummings Rd. Bus. Park Ass'n*, No. Civ.A. CV-04-63, 2005 WL 3678051, at *1, 4, 9-10 (Me. Super. Ct. Nov. 14, 2005) (holding that the creation of eight units— each with separate building envelopes—on a single parcel of land effectively subdivided the single lot into numerous identifiable lots of land). Instead, questions of ownership require that we look to the declaration of condominium and subdivision plan at issue to determine whether the developers intended to create identifiable interests in separate land. *See, e.g.*, *Villas by the Sea Owners Ass'n v. Garrity*, 2000 ME 48, ¶ 5, 748 A.2d 457.

[¶13] We review an interpretation of a declaration of condominium in the same way as we would review an interpretation of a contract. *Farrington's Owners' Ass'n v. Conway Lake Resorts, Inc.*, 2005 ME 93, ¶ 10, 878 A.2d 504. "We construe contracts in accordance with the intention of the parties, which is to be ascertained from an examination of the whole instrument. . . . Ultimately, we seek to give effect to the plain meaning of the words used in the contract. . . ." *Dow v. Billing*, 2020 ME 10, ¶ 14, 224 A.3d 244 (citation and quotation marks omitted). "[T]he proper standard of review depends on whether the contract language at issue is ambiguous, which we determine de novo." *55 Oak St. LLC v. RDR Enters., Inc.*, 2022 ME 28, ¶ 15, 275 A.3d 316. "If a contract is ambiguous,

8

this Court reviews the interpretation of the contract for clear error by the fact finder. If a contract is unambiguous, this Court reviews its language de novo." *Id.* (citation omitted).

[¶14] The Heel Way Subdivision's Declaration of Condominium, in defining "Unit Boundaries," states, "The six Units shall be bounded as depicted on the Plat and shall include everything located on the site including any buildings and/or structures and all other improvements now or hereafter located within said bounds." The residents assert that the word "everything" indicates that the Declaration of Condominium intended to convey interests in land, noting that the Declaration lacks language limiting the unit boundaries to the interior of the dwellings. However, the Declaration states that "everything" includes "buildings," "structures," and "improvements." It does not state that "everything" includes an interest in the land on which the units sit. The associated words indicate that by "everything," MD 365 intended to convey an interest in the improvements and structures above ground rather than an interest in the land itself. Moreover, unlike the fee simple interests conveyed by the campground owner in *Michaud*, 444 A.2d at 42-44, the Declaration's definition of "Unit" does not include any mention of land or manifest an intent to convey a fee simple interest in any land. Finally, throughout the Declaration,

it refers to the development as the singular "property" and carefully describes the owners as "unit owners" rather than land or lot owners. Accordingly, the plain language of the Declaration does not indicate an intent to subdivide the land into separate lots with identifiable interests in the land itself.

[¶15] Moreover, the Planning Board record includes, and the Board considered, several other documents that indicate that MD 365 intended to convey only an interest in the structures and not an interest in the land. The Heel Way Subdivision Application Narrative stated, in more than one place, that "[t]he Proposed subdivision will not create any new lots" and "[n]o new lot lines are proposed." Similarly, the Summary Declaration of the Heel Way Subdivision stated,

> The six homeowners will share ownership of the land, with both common elements and limited common elements. All portions of the subdivision which do not lie within the boundaries of a designated home or a designated storage unit are to be owned in common. All homeowners have an undivided ownership interest in all of the common land and improvements.

[¶16] Because the Heel Way Subdivision will not create three or more lots, the Planning Board did not err in concluding that the access-road requirements did not apply. *See* Mount Desert, Me., Subdivision Ordinance § 5.14.1.

## C.    Performance Guarantee

[¶17]  Section 5.12.1 of the Subdivision Ordinance grants the Planning Board the discretion to require a developer to file a "performance guarantee in an amount sufficient to defray all expenses of the proposed improvements." The guarantee can come in the form of a performance bond.  Mount Desert, Me., Subdivision Ordinance § 5.12.1.  However, section 5.12.4 gives the Planning Board the discretion to waive the performance-bond requirement and "recommend a properly executed conditional agreement with the Town" that imposes certain requirements that must be met before a developer can convey a lot or unit in a subdivision.  The conditional agreement must, among other things, be certified by "the appropriate municipal officers to the effect that *all improvements* have been satisfactorily completed in accordance with all applicable standards (State, Federal, and local codes, Ordinances, laws, and regulations)."  *Id.* § 5.12.3 (emphasis added); *see id.* § 5.12.4.

[¶18]  The Planning Board opted to waive the performance bond and instead required MD 365 to accept a conditional agreement:

> Before any unit in the subdivision may be sold and before construction of any new buildings (excepting only the storage/utility building), the Board will require prior certification from the Code Enforcement Officer to the effect that all infrastructure improvements (specifically water, sewer, electric, stormwater, and adequate construction access) have been

satisfactorily completed in accordance with all applicable standards (State, Federal, and local codes, Ordinances, laws, and regulations).

The residents, pointing to improvements specifically listed in the parentheses, contend that the Planning Board excluded construction of the access road from the required improvements by failing to list the requirement in the parentheses. They contend that because the conditional agreement must ensure the completion of all improvements, the Planning Board acted beyond the scope of its lawful authority, abusing its discretion. However, as discussed above, the Planning Board did not err in concluding that the Heel Way Subdivision did not need to comply with the access-road requirements. *See supra* ¶¶ 8-16. Therefore, the Planning Board did not need to list in the conditional agreement that the construction of a road was a required improvement. Accordingly, because the Planning Board's conditional agreement serves as an adequate performance guarantee within the scope of the Ordinance, the Planning Board did not abuse its discretion in not requiring a performance bond.

## D.    Density Requirements

[¶19] The residents next argue that the Planning Board erroneously calculated the Subdivision Ordinance's density requirements. The Subdivision

Ordinance allows developments that are characterized as "workforce subdivisions" to have a greater density than other types of subdivisions. *See* Mount Desert, Me., Subdivision Ordinance § 5.16.2(2). The Subdivision Ordinance states,

> The density of the subdivision shall not exceed the density requirements of the zone in which it is located. Density is calculated by applying the minimum lot sizes to the developable portion of the parcel (i.e. not wetland or steep slope). For the purpose of calculating density for subdivisions that include Workforce Housing, the area of the entire parcel may be used (i.e. including wetland or steep slopes).

*Id.* § 5.16.2(2)(a). It then provides that "[a]n increase of up to 75% in the gross residential density of the site may be permitted if 100% of the residential units are conveyed with covenants designed to benefit the creation and preservation of workforce housing." *Id.* § 5.16.2(2)(c)(2). The Subdivision Ordinance thus establishes a three-step process that culminates in adding the workforce-housing bonus to the basic permissible density to produce a final permissible density.

[¶20] In applying the formulae prescribed by the Subdivision Ordinance, the Planning Board determined that the entire parcel of the Heel Way Subdivision is 0.9 acres or 39,204 square feet, and that all of the units within the subdivision will be subject to covenants designed to benefit the creation

and preservation of workforce housing. The Zoning Ordinance provides that the minimum lot size for the zoning district in which the Heel Way Subdivision is located is 10,000 square feet. *See* Mount Desert, Me., Land Use Zoning Ordinance §§ 3.4-3.5. Dividing 39,204 square feet by 10,000 square feet, the Planning Board calculated that without the workforce-subdivision bonus, the ordinance permitted the development to consist of approximately 3.9 units.

[¶21] The Planning Board then proceeded to the second step of the computation to calculate the workforce-housing bonus, which would be added to the 3.9 figure to provide the final permissible number of units. It did so by multiplying 39,204 square feet by 0.75 (based on the permissible increase of up to 75% in the gross residential density for workforce housing), which equals 29,403 square feet. The Board then divided 29,403 square feet by the minimum lot size of 10,000 square feet, which produces a workforce housing bonus of approximately 2.9 units. In the third and final step of the process, the Planning Board added the 2.9 additional units permitted by the workforce-housing bonus to the 3.9 units that are permitted without the bonus, concluding that the Subdivision Ordinance allowed a total of 6.8 units in the development. Because a developer cannot build 0.8 of a unit, the maximum number of units is six total units—the number of units proposed in the Heel Way Subdivision application.

14

[¶22]  The residents argue that the Planning Board erred by failing to truncate (to a whole number) the number of permissible units in each of the first two steps of the calculation before the two figures are added to produce the final permissible number of units.  Under the residents' methodology, the result in the first step of the computational process should be truncated to three units, because a developer cannot build .9 of a unit, and that figure should be used in the computation of the workforce housing bonus figure.  Applying the residents' approach, three multiplied by 1.75 (representing the number of additional units permitted by the 75% density bonus allowed for developments designated as 100 percent workforce housing plus the number of units permitted without the bonus) equals 5.25.  The residents contend that this means that the maximum permissible number of units in the development is five workforce housing units.

[¶23]   However, nothing in the Subdivision Ordinance or Zoning Ordinance requires truncating to a whole number the result of the calculation in each preliminary step before reaching the final number of permissible units. The Subdivision Ordinance's use of the word "gross" in discussing the workforce bonus indicates that the Subdivision Ordinance was intended to

allow the Planning Board to avoid rounding in making its calculations.[2] Accordingly, the Planning Board did not err when it interpreted and applied the Town's Subdivision Ordinance and determined that the Heel Way Subdivision complied with the Subdivision Ordinance's density limits.[3]

### E. Open-Space Requirements

[¶24] Section 5.16 of the Subdivision Ordinance, titled "Cluster and Workforce Subdivision," includes open-space requirements.[4] (A. 97-98.) Subsection 5.16.2(3) begins:

> Open Space requirements: The cluster subdivision must include open space that meets the following requirements:

---

[2] The Subdivision Ordinance uses both the terms "gross" and "net" in describing the methods of calculating the density (albeit in different sections), suggesting that the use of different terms is significant. Section 5.16.2(2)(c)(2) of the Subdivision Ordinance provides, "An increase of up to 75% in the *gross residential density* of the site may be permitted. . . ." Mount Desert, Me., Subdivision Ordinance § 5.16.2(3)(c)(2) (May 8, 2018) (emphasis added). Another section provides, "Overall *net density* shall be determined by the total number of proposed dwelling units and the total acreage (including open spaces and recreational areas) within the subdivision." *Id.* § 5.7.3(3) (emphasis added).

[3] In its decision, the Planning Board also provided an alternative methodology and calculations that reached the same result. Because we affirm the Planning Board's calculations based on the methodology described above, we do not address the merits of its alternative methodology and calculations.

[4] A different section of the Subdivision Ordinance, section 5.10, titled "Open Space Provisions," contains a subsection that allows the Planning Board to require a developer to reserve an area of land as open space. *See* Mount Desert, Me., Subdivision Ordinance § 5.10.2. This discretionary provision is separate from the open-space requirements specified in subsection 5.16.2(3) and is not relevant to the question of whether Section 5.16's open-space requirements are met. *See id.* § 5.16.2(3). Exercising this discretionary power under section 5.10, the Planning Board required the Heel Way Subdivision to reserve 1,600 square feet of undeveloped land.

> a. The total area dedicated for open space must equal or exceed the sum of the area by which the building lots are reduced below the minimum lot size otherwise required for the respective zone (i.e. the non-cluster subdivision minimum lots size). Open Space requirement for Workforce Housing: When calculating open space requirement for qualified workforce housing development, the density bonus units shall be excluded.

(A. 97.) After concluding "that the Project is a Workforce Housing subdivision (and not a Cluster Subdivision under [the Zoning Ordinance] or . . . the Subdivision Ordinance)," the Planning Board determined "that the Open Space requirements for Cluster Subdivisions under 5.16.2[(3)] do not apply."

[¶25] As noted above, *see supra* ¶ 7, we give the Board's interpretation no deference. Instead, we interpret the language of the Ordinance in light of its purpose and structure as a whole, avoiding absurd results. *See Portland Reg'l Chamber of Com.*, 2021 ME 34, ¶ 24, 253 A.3d 586 ("We construe words in an ordinance according to their plain meaning and construe undefined or ambiguous terms reasonably with regard to both the objects sought to be obtained and to the general structure of the ordinance as a whole." (quotation marks omitted)); *id*. ¶ 23 (explaining that if the language of an ordinance is plain, "[w]e interpret the ordinance accordingly, unless the result is illogical or absurd." (quotation marks omitted)).

[¶26] When we apply these principles to a reading of the text of section 5.16.2(3), two points emerge: (1) there is an open-space requirement for Workforce Housing subdivisions, and (2) that requirement differs from the requirement for Cluster Housing subdivisions. As reflected in the discussion above regarding density limits, and looking at the Ordinance as a whole, the purpose of Workforce Housing is to allow denser development, i.e., with less open space. Hence, six units are allowed on this lot as opposed to three. That said, section 5.16.2(3) clearly imposes *some* open space requirement for Workforce Housing. It expressly references "Open Space requirement for Workforce Housing," and explains how to calculate the open space required.

[¶27] Indeed, in its briefing before us, MD 365 does not ask us to interpret section 5.16.2(3) as imposing *no* open space requirement; rather, it argues that applying to its development a calculation that excludes the density bonus units results in a requirement of no open space.

[¶28] But although we find the proffered computation eminently plausible, and the Planning Board considered this calculation at a meeting on October 24, 2023, the Board ultimately did not base its decision on that ground, instead concluding that the open-space requirement simply did not apply. As a court reviewing the decision of an administrative body, we cannot affirm the

body's decision on a ground that the body did not rely upon in its decision. *See In re Me. Motor Rate Bureau*, 357 A.2d 518, 526-27 (Me. 1976) ("'[I]n dealing with a determination or judgment which an administrative agency alone is authorized to make, [a court] must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain . . . set aside exclusively for the administrative agency.'" (quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

[¶29] Hence, we must remand for the Planning Board to make the calculation, which may very well result in a finding that no open space is required.

The entry is:

> Judgment vacated. Remanded to the Business and Consumer Docket with instructions to vacate the Planning Board's decision and remand the matter to the Planning Board for further consideration consistent with this opinion.

Grady R. Burns, Esq. (orally), Bernstein Shur, Portland, for appellants Ann Cannon, Marc Cannon, Mellisa Cannon Guzy, Lamont Harris, Stuart Janney, Joseph Ryerson, and Lynne Wheat

P. Andrew Hamilton, Esq. (orally), Eaton Peabody, Bangor, for appellee Town of Mount Desert

Daniel A. Pileggi, Esq. (orally), Acadia Law Group, LLC, Ellsworth, for appellee Mount Desert 365

Business and Consumer Docket docket number BCD-APP-2024-2
For Clerk Reference Only